73 A.3d 1199

**Gary HILTZ**

v.

**Melissa HILTZ.**

No. 1433, Sept. Term, 2011.

Court of Special Appeals of Maryland.

Sept. 3, 2013.

318

Steven D. Shemenski (Law Office of James E. Crawford, Jr. and Assoc., LLC, on the brief), Arbutus, MD, for Appellant.

Richard V. Lynas, Towson, MD, for Appellee.

Panel: GRAEFF, HOTTEN, RAYMOND G. THIEME, JR. (Retired, Specially Assigned), JJ.

HOTTEN, J.

In this divorce action between Gary Hiltz ("Gary"), the appellant-cross-appellee, and Melissa Hiltz ("Melissa"), the appellee-cross-appellant, the Circuit Court for Baltimore

County granted the parties a divorce, and granted Melissa indefinite alimony, a monetary award, an equal interest in the marital portion of Gary's two pensions,[1] and attorneys' fees. Additionally, the court ordered the marital home be held in trust until its sale and that the proceeds be equally divided between the parties. Finally, the court ordered the sale of the one-third interest the parties maintained in Delaware real property, and that those proceeds be equally distributed between Melissa and Gary.

Gary timely noted an appeal to this Court. In response, Melissa filed a cross-appeal. In sum, both parties presented five questions for our review. We have consolidated, rephrased, and reorganized them as follows:[2]

1. Whether the circuit court erred when it determined that Gary was required to present clear and convincing evidence to rebut the presumption that Melissa was permanently disabled and whether it equally abused its discretion in awarding indefinite alimony based on that presumption.

2. Whether the circuit court erroneously calculated the amount of indefinite alimony awarded to Melissa.

---

1. Specifically, the court ordered that a QDRO be prepared and that Gary name Melissa as the alternate payee in his pension plans.

2. Gary framed the issues as follows:
   1. Did the [c]ircuit [c]ourt [e]rr in [f]inding that [a]ppellee is [d]isabled?
   2. Did the [c]ircuit [c]ourt [e]rr in its [a]ward of [p]ermanent [a]limony?
   3. Did the [c]ircuit [c]ourt [e]rr in [i]ts [d]etermination of the [m]arital award?
   Melissa presented these two additional questions for our review:
   1. Was the [l]ower [c]ourt [j]udge erroneous by finding that the [c]ross-[a]ppellee had not dissipated approximately $40,000[ ] from two bank accounts between September[ ] 2010 [and] July[ ] 2011[,] and[,] therefor[e] fail[ ] to include said dissipated funds in determining the [c]ross-[a]ppellant's monetary award?
   2. Was the [l]ower [c]ourt [j]udge erroneous by attributing $750[ ] of [c]ross-[a]ppellant's expenses to her son and grandson [thereby] abusing his discretion in only awarding $650[ ] per month [in] alimony to [c]ross-[a]ppellant?

3. Whether the circuit court erred in granting Melissa a monetary award in the amount of $88,848.50 and additionally erred in its denial of Melissa's request for a finding of dissipation of marital property.

4. Whether the circuit court abused its discretion in awarding Melissa attorneys' fees in the amount of $10,000.

For the reasons outlined below, we affirm the circuit court's judgment of divorce. Because we conclude, however, that the court applied the incorrect standard in its finding of permanent disability, thereby abusing its discretion in awarding indefinite alimony, we shall vacate the remaining judgments and remand the case for further proceedings consistent with this opinion.[3]

## I.

### FACTUAL AND PROCEDURAL HISTORY

After courting for approximately two years, Melissa and Gary were married in May 1990. The couple moved into a modest townhouse, purchased prior to their nuptials in Baltimore County, Maryland. Gary subsequently adopted Melissa's son from a previous marriage, named Jonathan Hiltz ("Jonathan"), born in 1986. Jonathan was approximately three and one-half years-old when Melissa and Gary were wed.

At the inception of their marriage, Melissa was working for the American Neurological Association as a medical secretary. She had previously obtained her high school diploma and had

---

**3.** As this Court noted in *Doser v. Doser*, 106 Md.App. 329, 664 A.2d 453 (1995), "The factors underlying awards of alimony, monetary award, and counsel fees are so interrelated that, when a trial court considers a claim for any one of them, it must weigh the award of any other .... Accordingly, when this Court vacates one such award, we often vacate the remaining awards for re-evaluation." *Id.* at 335, 664 A.2d 453 (internal citations omitted), *quoted in Kelly v. Kelly*, 153 Md.App. 260, 279–80, 836 A.2d 695 (2003) (remanding the issue of attorney's fees upon reversal of monetary award). *See, e.g., Randolph v. Randolph*, 67 Md.App. 577, 589, 508 A.2d 996 (1986) (vacating counsel fees award upon reversal of monetary award).

attended a few community college classes in medical terminology and typing. Nonetheless, both she and Gary decided that Melissa would resign from her full-time employment, and find part-time work closer to home in order to assume the role of primary caretaker and homemaker.[4] Gary ardently believed the decision would better serve the family

> if she didn't have to work full-time because she had a little bit more on her at home than [Gary] did . . ., [because] she took care of more of the inside of the house[.] [Gary] just felt it would be better for her[,] [because they] had a son . . . . Instead of putting him in daycare, [Gary] wanted him to be raised by [Melissa and him] instead of some stranger.

In addition to caring for the parties' son, the home, and working part-time, Melissa managed the family's financials and did most of its banking. Despite Melissa's history of fibromyalgia,[5] managed by prescription medications, she lived a fairly active lifestyle. She enjoyed fitness and the outdoors and partook in hiking, swimming and exercise videos. Further, she would take their son, Jonathan, to play laser tag. Gary, on the other hand, assumed the role of primary financial provider, working as a journeyman electrician and actively participating in the electrical union.

---

**4.** The record is unclear regarding Melissa's hourly wages at the time she resigned from the American Neurological Association. At trial, she was uncertain whether she had earned eleven dollars an hour or the seventeen dollars an hour that Gary alleged.

**5.** Fibromyalgia is an incurable, chronic disorder characterized by widespread musculoskeletal pain, fatigue, and tenderness in localized areas. *See* Fibromyalgia, Definition (Jan. 22, 2011), http://www.mayoclinic.com/health/fibromyalgia/DS00079 (last visited March 3, 2013). "Researchers believe that fibromyalgia amplifies painful sensations by affecting the way [the] brain processes pain signals." *Id.* Common symptoms include moderate to severe fatigue, decreased exercise endurance, sleep problems, depression, anxiety, headaches, irritable bowel syndrome, restless legs, and painful menstrual periods. See Fibromyalgia, What are the symptoms of fibromyalgia?, http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/arthritis_and_other_rheumatic_diseases/fibromyalgia_85,P00913 (last visited March 3, 2013).

Together, the parties lived a fairly comfortable middle-class lifestyle. Although Melissa and Gary did not particularly worry about their finances, they used their incomes and savings conscientiously. Indeed, the parties satisfied the thirty-year mortgage on their townhouse in less than ten years. Additionally, if Melissa and Gary used credit cards, they would satisfy the debts within a month's time. Melissa and Gary "never had outstanding debts[,] and [they] had no car loans." Nonetheless, Melissa and Gary were able to eat at restaurants several times a week, and Melissa could occasionally go shopping without worry.

After satisfying the mortgage on their townhouse, Melissa and Gary purchased a second home in Baltimore County, Maryland for $170,000 cash from Gary's parents in the summer of 2004. In addition, the parties amassed approximately $200,000 in a joint savings account.

Notwithstanding these accomplishments, Melissa and Gary began experiencing problems within the first five years of their marriage. Specifically, Melissa disapproved of the manner in which Gary disciplined Jonathan for any wrongdoing. At trial, Melissa characterized the early conflict in their marriage as follows:

> There were a lot of issues. They started pretty shortly after we were married and we moved in as a family. There were issues surrounding our son[,] Jonathan[,] and how he was disciplined. Gary would get very angry and very upset with any, it seemed like small things that Jonathan would do. Gary would start hollering at [Jonathan,] and he would cry[.] I would step in and ask [Gary] to please control [his] temper . . . and he would just turn his anger on me, telling me that Jonathan and I were ganging up on him.

As a consequence, Melissa and Jonathan moved out of the marital home for a period of a week, moving in with Melissa's parents. Following a few telephone conversations, Melissa elected to return to the marital home with Jonathan. Thereafter, Melissa and Gary sought counseling from their Lutheran pastor.

Unfortunately and shortly after Melissa and Jonathan moved back to the second home in Baltimore County, Melissa suffered a serious back injury in April of 2004. Melissa described the injury during her direct examination at trial:

> Okay. Well ... I woke up one morning and felt very stiff in my back[,] and I stretched and [ ] overstretched and felt a popping, [and I] had immediate pain[.] [I] was in pain for several days after that[,] and I went to see my doctor who was treating me for fibromyalgia[;] and[,] he ordered MRI's[.] [I]t showed a ruptured disc in my lumbar back and a ruptured disc in my thoracic, which is my mid-back[.] [The MRI] also [revealed] some spinal stenosis and arthritis in my hips and shoulders and back.

Melissa's injury exacerbated her fibromyalgia. As a result, Melissa's ability to engage in the everyday physical activities prior to her injury was severely limited. She could neither play with her son the way she had previously, nor care for the marital home in the same manner she did prior to her injury. According to Melissa, the pain became increasingly unbearable, resulting in Melissa leaving her part-time employment. As a consequence, Gary suggested to Melissa that she apply for Social Security disability. Melissa's constant back pain, in addition to the death of both her grandmother and father, caused her to slip into a deep depression.

Thus, when Gary came home after a day of work and criticized Melissa for her failure to maintain the home the way she used to and for not preparing his dinner, she resented it. At trial, Gary represented the developing tension between Melissa and he as follows:

> It started to get a little bad when we moved into ... 5210 ½ [,] because she started to develop back problems and they prescribed [pain medication] and sleeping pills and muscle relaxers[. S]he became real sensitive when I would say something to her about cleaning the house. She was letting things go to where she wasn't cleaning the house like she was before. And I would come home a lot and she would just be laying on the couch. And I mentioned to her that she, I wish I could lay down on the couch all the time. I

mean, I would come home and she would be on the couch all the time[,] and I finally would say something[ ] because it got to me after a while when the house was getting real messy and she wasn't cooking for me as much. She would make me wait until 7:00 or 8:00 at night to eat, knowing that I would get home like around 4:00.

The arguments between the parties worsened, and Melissa informed Gary that she was leaving in the spring of 2005. Gary, however, prohibited her from leaving the home. As a result, Melissa telephoned 911 emergency for assistance. Thereafter, she was escorted from the marital home by police.

Melissa and her son moved into her mother's home, located in Dundalk, Baltimore County, Maryland.[6] When she moved out of the marital home, Melissa withdrew approximately $103,000 from the parties' joint savings account. She believed that taking half of their savings to support herself during the period of their separation was appropriate. Because Melissa's mother had moved to Florida, Melissa was responsible for paying for all the utilities associated with her mother's residence and also for placing food on the table for herself and her, then, nineteen year-old son. Large portions of the money she withdrew, however, would later be used towards efforts to save the family's dog, to assist Jonathan with his legal troubles, and to partially support Jonathan and her grandchild.

After learning that Melissa had withdrawn the funds from their joint savings account, Gary placed the remainder of the monies in a separate account in his name, listing his parents as the beneficiaries. Nonetheless, Gary made efforts to reconcile with Melissa. He would telephone Melissa—albeit several times a day—and additionally visited Melissa, unannounced, at the Dundalk home. Initially, Melissa rejected Gary's efforts, advising him to seek psychiatric and psychological care for what she characterized as his anger management problems. Eventually, Gary acquiesced to Melissa's request. Later,

---

6. The record indicates that Melissa's mother ultimately gifted the property to Melissa on October 27, 2008, in fee simple absolute.

Melissa and Gary resumed marital relations, and Gary would visit Melissa at her Dundalk address for a period of approximately three years. In late 2007, Melissa and Gary agreed to fully reconcile their conflicts and that Melissa would return to the marital home.

Shortly thereafter, the parties went on a "second honeymoon" to Canada during the winter of 2008. Overall, Melissa and Gary enjoyed the trip, but the conflict between them resumed. The ride home had exacerbated Melissa's back pain. Gary ignored her requests to stop and continued driving until the parties reached home. Thereafter, Melissa questioned whether Gary had, indeed, undergone the transformation he had alleged to her.

In June of 2008, Melissa left the marital home one final time. At trial, both parties agreed that the circumstances leading to Melissa's final departure premised on utility bills relating to the Dundalk address. Gary began arguing with Melissa; and, as a consequence, her mother stepped in to defend her. Melissa briefly described the circumstances which caused her final departure:

My mother and her husband were going to come up from Florida to visit. Originally, they were supposed to stay at the Page Drive address, which was where she had been living and my son was living there since I was living at Wilkins Avenue. My son smokes. They didn't want to stay at the house because of the smoking[. S]o Gary and I, I talked to Gary and we agreed that they could spend the night, you know, a couple nights with us. And while we were there, several times he had done things, said things to me that my mother didn't like. I was sick and there was an incident where he was outside trying to change a light on a lamp post outside. I told him that I was sore, I couldn't do it. I, my mom went out to do it[,] and he came in and was mad at me and why, you know, you can't do that, you should be able to do that. The final thing was, I had some mail that had come in from the Page Drive address. He knew I was still paying the bills at Page Drive [the Dundalk address] and he tried to take the bill from me. I didn't

want him to take the bill. We got into an argument over that[,] and he started again hollering at me and, you know, doing what he normally did, being berating and name calling[;] and my mother came out[,] and she just stepped in, just like I had done with, you know, Jonathan, now she's doing it with her child. She stepped in and told him not to talk to me that way[,] and he got angry at her and told her to get out[,] and I said, ["]It's okay, Mom, you know, go[,] and I'm going to go with you[."] [A]nd that was when I left.

Thereafter, Melissa moved back into the Dundalk residence, where she would remain for an additional two years before subsequently filing her complaint for absolute divorce on July 14, 2010.

After a two day trial commencing on July 25, 2011, the circuit court issued its oral opinion on August 4, 2011. The court granted a judgment of divorce and granted Melissa indefinite alimony, a monetary award, an equal interest in the marital portion of Gary's two pensions,[7] and attorneys' fees. In addition, the court further ordered the marital home be held in trust until its sale and that the proceeds be equally divided between the parties. Finally, the court ordered the sale of the one-third interest the parties maintained in Delaware real property and that the proceeds be equally distributed between Melissa and Gary. Thereafter, Gary filed a motion for new trial on August 12, 2011. He argued that the circuit court's finding of disability was erroneous because it contravened the weight of the evidence presented at trial. While Gary's motion was pending before the circuit court, he noted an appeal to this Court on September 2, 2011. In addition, Gary filed an amended motion for new trial pursuant to Maryland Rule 2–533 on August 19, 2011. Concomitantly, Melissa filed a petition for contempt of court against Gary for failing to adhere to the circuit court's judgment of August 16, 2011. She additionally noted her cross-appeal to this Court on September 15, 2011. After reviewing the parties' petition and

---

7. Specifically, the court ordered that a QDRO be prepared and that Gary name Melissa as the alternate payee in his pension plans.

amended motion, and after considering arguments of counsel, the circuit court denied Gary's amended motion for new trial and sanctioned him with commitment to the Baltimore County Department of Corrections on November 14, 2011.[8]

Additional pertinent facts with be provided *infra* as necessary to resolve the issues presented.

## II.

## DISCUSSION

### (A) WHETHER THE CIRCUIT COURT ABUSED ITS DISCRETION BY ERRONEOUSLY FINDING THAT MELISSA IS PERMANENTLY DISABLED AND BY AWARDING MELISSA INDEFINITE ALIMONY.

In his first assignment of error, Gary avers that the circuit court erroneously found that Melissa was permanently disabled by relying solely on letters indicating an award of disability benefits and wrongly awarded her indefinite alimony. Specifically, Gary contends that the court, in effect, concluded that Melissa was disabled without evidence to support such a determination and improperly created a higher burden of proof to rebut Melissa's assertions that she was disabled on the basis of her receipt of social security benefits. He further argues that such a finding "substantially affected" the court's required consideration of Sections 11–106(b) and (c) of the Family Law Article's factors within its alimony determination and, thus, resulted in an erroneous award of indefinite alimony. We agree.

### (1) Gary's Contentions Are Properly Preserved For This Court's Review.

■■■■ Because this Court ordinarily "will not decide any other issue unless it plainly appears by the record to have

---

**8.** The circuit court noted, however, that Gary could "purge his contempt by making payment of ... []$106,648.50[] to [Melissa] and providing written verification thereof to the [c]ourt."

**330**

been raised in or decided by the trial court[,]" Md. Rule 8–131(a),[9] we preliminarily address the issue of preservation. That the issue appears to be plainly raised in or decided by the court is a matter of basic fairness to the trial court and to opposing counsel, as well as being fundamental to the proper administration of justice. *Medley v. State*, 52 Md.App. 225, 231, 448 A.2d 363 (1982) (discussing Maryland Rule 8–131(a)'s predecessor, Md. Rule 1085). Thus, when a party fails to draw the court's attention to a claimed error and the court fails to decide the issue, the party is estopped from obtaining review of the issue on appeal. In that regard, Melissa contends that the court's disability and indefinite alimony ruling are foreclosed from our review because Gary failed to raise any objection to the admission of two letters documenting an award of disability benefits from the Social Security Administration. As explained, *infra*, Melissa's assertions are misconceived. Therefore, Gary's contentions that the circuit court erroneously found Melissa permanently disabled and wrongly awarded her indefinite alimony are properly before us for our consideration.

To be sure, no objection was raised when Melissa offered into evidence her Social Security Administration notices of disability benefits awards. Gary never quarreled with their admission. Rather, Gary's contentions are premised on whether Melissa *satisfied her burden* of proving her permanent and total disability. These contentions were debated below at great length through the admission of conflicting evidence and argument of counsel.

---

9. Maryland 8–131(a) outlines the scope of this Court's review and provides, in pertinent part:

(a) **Generally.** The issues of jurisdiction of the trial court over the subject matter and, unless waived under Rule 2–322, over a person may be raised in and decided by the appellate court whether or not raised in and decided by the trial court. Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal. Md. Rule 8–131(a) (emphasis in original).

At the close of the two-day trial, Melissa's counsel argued that an award of Social Security disability benefits to Melissa created a nearly irrebuttable presumption that Melissa was, in fact, disabled, therefore lacking the capacity to work and earn any additional income. Specifically, counsel asserted:

Your Honor, this is a case, I **think it's clear that it's a matter of he said, she said, who's telling the truth.** I mean, according to [Gary], my client is working out during this time and she says she's not able to hardly clean the house and she's boxing and she's riding a bike, doing push-ups, etcetera, three times a week at home and at the gym. So their testimonies couldn't be more diametrically apart than what it is. I believe my client is a very credible witness. We have an individual here that up until spring of 2004, she was leading a, living a healthy life. They were having problems in their marriage. She got, she hurt her back through no fault of her own. She got depressed. It got so bad that she was not able to work. **She did file for social security disability. [Gary] even encouraged her to do that. She was granted that social security disability. As you know, the [c]ourt, judicial notice, you have to be totally disabled to be eligible to receive that. She had to go through a whole process, trial and medical records, etcetera. Through that process she was found to be totally disabled. I think [Gary] here is trying to retry that case. He hasn't presented any evidence to the contrary. His only evidence is his testimony, which, to me, lacks a lot of credibility, that she's been able to do all these things.**

(emphasis added).

In response, the circuit court asked both parties if there was any authority supporting Melissa's assertion that no further evidence of physical or mental impairment was required to support a finding that she was totally and permanently disabled. The court unequivocally inquired:

[Are there] any cases that you can point me to, any Maryland cases that discuss the, the effect of a social security disability finding in a case like, in, in a case like, is

there a presumption of correctness, is there no presumption or correctness, is there, is it simply evidence[?]

Thereafter, during the following colloquy, the court expressed concerns regarding the lack of medical evidence to support Melissa's insistence that she was, indeed, disabled:

[Melissa's counsel]: I don't—

[THE COURT]: Anything on that, anything on those lines?

[Melissa's counsel]: Not that I know of but—

[THE COURT]: **I mean, because there's been no medical, there's been no medical evidence in this case whatsoever.**

[Melissa's counsel]: Right.

[THE COURT]: **On the issue of disability, none. Which, quite frankly, concerns the [c]ourt. There was, there was a lot of, it was questioning by the, by [Melissa] by [Gary] whether he has any information to contradict the fact, the claim that [Melissa] is disabled and he said no, he has no, you know, medical evidence. But it begs the question, in my mind, is where's the medical testimony or medical evidence that she is disabled, other than the, other than the notice from, the finding from the Social Security Administration?**

[Melissa's counsel]: Your Honor—

[THE COURT]: **So that's all I have to go on and my question is what weight do I give it?**

[Melissa's counsel]: I think you should give it a lot of weight.

[THE COURT]: Well, I know but you have, **is there any authority to support that position?**

[Melissa's counsel]: Your Honor, this has been decided by a [c]ourt, [f]ederal [c]ourt. I mean, personally, maybe—

[THE COURT]: (inaudible) [f]ederal [c]ourt, it was done by an agency.

[Melissa's counsel]: Federal agency. **I was, I didn't think we had to re-litigate her disability.**

[THE COURT]: **All right. Well, I don't know. I mean, that's why I'm asking you. You're saying that you**

don't, you don't think you got to re-litigate it so apparently you thought it had the weight of, that it was iron clad. So my question is, are there cases that say that?

[Melissa's counsel]: There may be, Your Honor, I don't have any right now.

[THE COURT]: Okay. All right.

[Melissa's counsel]: I would point out, I said before, I mean her testimony, her credibility. There's been no evidence contradicting the finding.

[THE COURT]: All right.

[Melissa's counsel]: I didn't think we would have to be in here re-litigating the ins and outs of her disability. She's already done that and I, I mean, I would, **I don't have any authority but I think there should be a presumption unless they have contradictory evidence that—**

[THE COURT]: **Well, I understand, I understand you think that there should be a presumption but I'm wondering if there's any, other than your own opinion, is there any legal authority for it?**

[Melissa's counsel]: No—

[THE COURT]: **Is there a, is there an irrebuttable presumption in statute anywhere, in case law anywhere, other than, other than, it's a good argument[?] I'm just wondering if there's any basis for it.**

[Melissa's counsel]: Your Honor, I could reach it. I don't have it now.

(emphasis added).

Gary's attorney responded to the circuit court's inquiry, reaffirming the court's observation that no medical evidence had been offered by Melissa. Specifically, his counsel noted:

... Your Honor, as it relates to the point, and **I want to emphasize again the issue of medical evidence. We haven't seen any and that certainly causes concern for the [c]ourt because without a shred of medical evidence, the [c]ourt simply can't just assume that there's an indefinite need here which, frankly, I think is, it's impos-**

sible for the [c]ourt to, to conclude[. T]hat's [Melissa's] responsibility, not our responsibility to prove she's disabled or not disabled. There is no presumption that she's disabled. She needed to be here with evidence in support of her contention and she just didn't . . . .

\* \* \*

. . . [I]n terms of alimony, you know, I really thought hard about what would even be an appropriate alimony determination and I think this instance, because she is going to receive a monetary award, I'm going to ask the [c]ourt not to award any alimony at all to start and the reason is this, is that, given the indication of what she can do, I think she is a perfect fit under the social security disability program to work part-time. If you take into consideration, under oath, her financial statement, which she indicates her expenses are $1,000, if you take into consideration that she will get at least $1,000 in social security benefits, even if she worked below the $1,000 and earned $800 a month, let's just throw that out there, she's ahead. She's making $600 a month. What this is going to require her to do though is stop supporting her twenty-four year old son and her grandchild and certainly that's unfortunate and certainly that's not a popular position to take because every child wants, every parent wants to help their child, but the reality is [Gary] shouldn't be on the hook to, to provide support for the other two—

\* \* \*

. . . I want to raise and point out this idea of reasonableness. The final demand by [Melissa] is indefinite alimony, far beyond what her needs are and a split of everything and don't worry about that $100,000 I took previously. That is what they're asking for. So I think that points directly to the reasonableness of [Melissa's] claim here, whereas, [Gary] had to defend this suit and he's defending a claim for indefinite alimony despite the fact that he has never received or he has never seen or no documentation has been introduced which would indicate her medical condi-

tion and I think that is unbelievably important in terms of the analysis of the reasonableness of either side and there cause of action . . . .

(emphasis added). Further affirming his argument, Gary emphasized that

> . . . the burden is on [Melissa]. The burden has always been on [Melissa,] and today is the trial date. Today was the date that any sort of expert would needed [sic] to be here to verify the concerns and the disability or the purported[ ] disability of [Melissa]. There has been zero medical evidence and I think on that basis, the [c]ourt would be in error to award anything other than short term, if any, alimony whatsoever.

(emphasis added).

Melissa refuted Gary's arguments and requested that the court take judicial notice of the Social Security Administration's determination that she was permanently and totally disabled. Specifically, her counsel noted:

> I think the [c]ourt can take judicial notice that, well, we do have the documents, we have the documents from the Social Security Administration that has found that she was totally disabled, that **there was obviously a process in making that determination. I think the [c]ourt can take judicial notice, there were probably a lot of medical records submitted at that time. As I stated before, counsel hasn't provided anything to controvert that.** Again, I think it has to do with credibility. I believe my client is very credible. She's an honest person, with integrity. I believe that if she can work, she would work. As far as working part-time, I mean, I heard [Gary's counsel] state the [f]ederal statute but I don't, I don't, he didn't actually cite the statute or brought the authority in here so he doesn't have the actual statute that says that she can work part-time. I think if she could work part-time, she would. I mean, this is a person who doesn't choose to be in her condition, particularly as someone who doesn't have a histo-

ry of being a (inaudible) or somebody who is fraudulent, someone who is dishonest . . . .

(emphasis added).

In reaching it conclusion, concerning alimony, the circuit court reasoned:

> . . . . On the issue of alimony, I will go through the factors as set forth in the Family law Article 11–106. Under . . . Subsection B, the required considerations are as follows. Number one is the ability of the party seeking alimony to be wholly or partly self-supporting and the [c]ourt, actually before even receiving the case from [Melissa's] counsel, did do some research on its own and I was very interested and brought this up to counsel during the hearing, what the, what the significance is of the award, from the disability award from [the] Social Security Administration and what effect the [c]ourt has to give that. I found no Maryland cases on that point[,] and **I did find these New Jersey, series of New Jersey cases and the Jersey cases are** *Golian v. Golian* **[344 N.J.Super. 337, 781 A.2d 1112 (Ct. App.Div.2001) ] . . . and it was followed by the case of** *Wasserman v.* **[***Parciasepe,* **377 N.J.Super. 191, 871 A.2d 781 (Ch.2004) ] . . . . And basically what these cases hold and, of course, New Jersey Law is not binding on Maryland but in the absence of any Maryland Appellate decisions, it's something to look towards. It states that the party who asserts an inability to work due to disability bears the burden of proving disability for purposes of defeating imputation of income but that a Social Security Administration adjudication of disability constitutes a** *prima faci[e]* **showing of disability, raises a presumption of disability regarding alimony, counsel fees and property distribution. Afterwards, the burden shifts to the other party to refute the presumption. The degree of proof needed to overcome a presumption of unemployability as a result of disability as it relates to alimony is clear and convincing evidence.** And, in fact, in the second case I cited, the party who was attempting to show, to refute the presumption had brought in a vocational expert

and brought in a, I think a physician, or some, some expert to, to refute the presumptions raised by the disability award.  So, in this case, we have an award of disability from [the] [S]ocial [S]ecurity [Administration].  **I think, I think these cases are persuasive and the award in this case from [S]ocial [S]ecurity disability, from Social Security indicating a disability, is *prim[a] faci[e]* evidence of [Melissa's] inability to work and although there is evidence in the record that, such as the credit card statements that show that [she] does not stay in bed all day as she claims, that she can shop and there's evidence she can exercise, evidence that she can hike, evidence that she picks up a three year old and changes his diaper, and changes him and the [c]ourt's observation that she was able to communicate effectively with counsel during these proceedings, take notes, receive notes from her sister who was sitting in the back, in the courtroom, and communicate effectively with counsel without any seeming difficulty.  Despite all that, that does not equate to clear and convincing evidence that she can work.  In** addition, you have the fact, the evidence that, in this case, the, her application for [S]ocial [S]ecurity disability benefits was encouraged and supported by [Gary].  **So, for all of those reasons, the [c]ourt finds that the disability award and the inability to, finding clear and convincing evidence to the contrary, supports the fact, supports the finding that . . . [Melissa] is dis [sic], you know, unable to work.**  So, under factor one, the [c]ourt finds that the party seeking alimony, here [Melissa], is not able or will not be able to be wholly self-supporting and she'll only be partly self-supporting by virtue of receipt, receiving the disability award of $1,001 a month.

(emphasis added).

Gary immediately filed a motion for new trial, arguing that the circuit court's finding of disability was in error because it contravened the weight of the evidence presented at trial. Additionally, Gary argued that the court improperly awarded indefinite alimony premised on the erroneous finding of dis-

ability. An amended copy of that motion was heard by the court on November 10, 2011. Gary averred:

> ... **Your Honor, the other argument we have pertains to the issue of alimony and the idea of disability and this was a point of significant contention at the trial itself.** Your Honor, the, the evidence provided by [Melissa] in this case was simply a note that, not a note, excuse me, a, an award by the Social Security Administration that she had been found disabled and that she was entitled to the $1,001 per month. Other than that, [Melissa] had no testimony or medical evidence to support her disability other than her, her own testimony. If the [c]ourt recalls, during examination or cross-examination, we submitted credit card statements, which indicate she was up and about virtually every day. The [c]ourt noted on the record that he observed [Melissa] assisting counsel during the course of trial. The [c]ourt also noted the various exercises that [Melissa] was also able to, to do and also noted that [Melissa] was able to, able to watch, watch the children, pick up the child, or [her] grandchild, and perform a variety of (inaudible) and also was at one point earning a salary of roughly $17 or $18 an hour. **Despite the mounting contrary evidence to the idea of disability, this [c]ourt found disability solely based upon the determination by the Social Security Administration that she was entitled to ... [disability] benefits. What [Melissa] failed to do in [her] case is to establish whether the, the things she was complaining about here in [c]ourt, was the basis for her social security disability relief. As the [c]ourt's well aware, one can be awarded social security benefits for a variety of reasons, including potentially alcoholism[,] but we received and you heard absolutely no medical evidence to support that it was because of her medical needs that she, in fact, was disabled. And, Your Honor, when, when this [c]ourt made its determination that she was disabled and, and entitled to indefinite alimony, we believe that the nexus between the justification of indefinite alimony and the nexus between her, in fact, being**

**disabled was not met in this situation.** And we believe a new trial as to that is, would also be necessary to really determine the idea of ... disability because, frankly, there was insufficient evidence provided at, at trial to, to show that ....

(emphasis added). Nevertheless, the circuit court denied Gary's motion. Since these specific contentions were raised in *and* decided by the circuit court, the issues are preserved and may be appropriately considered. *See* Md. Rule 8–131(a). We therefore turn our attention to the merits of Gary's contentions.

### (2) The Circuit Court Applied the Wrong Legal Standard To The Issue of Disability Thereby Abusing Its Discretion In Awarding Indefinite Alimony.

█ Title 42, Section 423 of the United States Code provides for the payment of insurance benefits to persons who have contributed to the Social Security Act's program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1)(E) (2004). Section 423(d)(1) of the Code defines a disability as the "inability to engage in any substantial gainful activity by reason of any medical determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ...." 42 U.S.C. § 423(d)(1)(A) (2004). *See also* 20 C.F.R. 404.1505 (2012) (providing the basic definition of disability). In addition, Section 423(d) further provides that an individual

... shall be determined to be under a disability only if his [or her] physical or mental impairment [10] or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the

---

**10.** A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3) (2004).

national economy,[11] regardless of whether such work exists in the immediate area in which he [or she] lives, or whether a specific job vacancy exists for him [or her], or whether he [or she] would be hired if he [or she] applied for work . . . . 42 U.S.C. § 423(d)(2)(A) (2004).[12]

In furtherance of this statutory language, the Social Security Administration ("SSA") outlined a "five-step sequential evaluation process," to determine an individual's disability status. 20 C.F.R. § 404.1520 (2012). The first step of the evaluation requires an applicant to demonstrate that he or she is not engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i) (2012). In order to determine whether an employee is performing substantial gainful activity, the SSA ordinarily considers whether the applicant or claimant's wages generated from work activity exceeds a financial threshold. *See* 20 C.F.R. § 404.1574(b)(2) (2012).[13] The monthly threshold amount for non-blind individuals for 2013 is $1,040. *See Substantial Gainful Activity*, Social Security (Oct. 16, 2012), http://www.ssa.gov/oact/cola/sga.html (last visited on June 14, 2013).[14] Therefore, wages under the monthly maximum are generally not considered substantial gainful activity for purposes of the disability analysis. *See* 20 C.F.R. § 404.1574(b)(3)(i) (2012). Thus, an applicant or claimant is

---

11. "[W]ork which exists in the national economy" is defined as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A) (2004).

12. There are, however, different rules for determining disability for individuals who have attained the age of fifty-five and are statutorily blind. *See* 42 U.S.C. § 423(d)(1)(B); 20 C.F.R. §§ 404.1577, 404.1578, & 404.1579.

13. Indeed, the SSA maintains a website which supplies updated calculations for the "substantial gainful activity" thresholds on an annual basis. *See Substantial Gainful Activity*, Social Security (Oct. 16, 2012), http://www.ssa.gov/oact/cola/sga.html (last visited on June 14, 2013).

14. The monthly threshold amount for statutorily blind individuals, *see* 42 U.S.C. § 423(d)(1)(B), for 2013 is $1,740. *See Substantial Gainful Activity, supra* note 12.

able to work so long as he or she does not surpass the monthly maximum amount of additional work-related earnings. *See* 20 C.F.R. § 404.1520(b) (2010).

That the SSA does not preclude disability insurance claimants from engaging in any work-related activity is an extremely relevant financial point in the present case. While an extra $1,040 per month may not be considered "substantial gainful activity" pursuant to the SSA's regulations, "such additional income can potentially be a vital financial resource" that must be factored into the circuit court's determination of the amount and duration of alimony, pursuant to Md.Code (1984, 2012 Repl.Vol.), § 11–106 *et seq.* of the Family Law Article.[15]

---

**15.** Section 11–106 outlines the requisite factors to be considered in the court's determination of the amount and duration of spousal support. Md.Code (1984, 2012 Repl.Vol.), § 11–106 of the Family Law Article. It provides:

(a) *Court to make determination.*—(1) The court shall determine the amount of and the period for an award of alimony.

(2) The court may award alimony for a period beginning from the filing of the pleading that requests alimony.

(3) At the conclusion of the period of the award of alimony, no further alimony shall accrue.

(b) *Required considerations.*—In making the determination, the court shall consider all the factors necessary for a fair and equitable award, including:

(1) the ability of the party seeking alimony to be wholly or partly self-supporting;

(2) the time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment;

(3) the standard of living that the parties established during their marriage;

(4) the duration of the marriage;

(5) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(6) the circumstances that contributed to the estrangement of the parties;

(7) the age of each party;

(8) the physical and mental condition of each party;

(9) the ability of the party from whom alimony is sought to meet that party's needs while meeting the needs of the party seeking alimony;

(10) any agreement between the parties;

(11) the financial needs and financial resources of each party, including:

*Cf. Gilligan v. Gilligan,* 428 N.J.Super. 69, 50 A.3d 110, 117 (Ch.2012). Consequently, we are called in this instance of first impression to determine whether an SSA disability award letter, by itself, and the proponent's own testimony regarding his or her impairment, are *prima facie* evidence that the proponent is, in fact, unable to earn any income through work-related activity because he or she maintains a permanent and total disability. We hold that they are not.[16]

We acknowledge that the severity of a disability may preclude an individual from working and earning an income, even below the SSA's "substantial gainful activity" threshold of $1,040 per month. Nonetheless, there are other social security disability recipients who maintain the ability to work part-time and earn at least some additional funds, however marginal, up to the substantial gainful activity threshold without losing their disability status. Accordingly, no rational basis

---

    (i) all income and assets, including property that does not produce income;

    (ii) any award made under §§ 8–205 and 8–208 of this article;

    (iii) the nature and amount of the financial obligations of each party; and

    (iv) the right of each party to receive retirement benefits; and

    (12) whether the award would cause a spouse who is a resident of a related institution as defined in § 19–301 of the Health—General Article and from whom alimony is sought to become eligible for medical assistance earlier than would otherwise occur.

    (c) *Award for indefinite period.*—The court may award alimony for an indefinite period, if the court finds that:

    (1) due to age, illness, infirmity, or disability, the party seeking alimony cannot reasonably be expected to make substantial progress toward becoming self-supporting.

    (2) even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate.

*Id.* (emphasis in original).

**16.** To be clear, however, Gary raised no objection below to the circuit court's treatment of the SSA's disability finding as, in effect, collaterally estopping him from relitigating the issue during the divorce proceeding. Consequently, we shall limit our analysis to the issues raised and decided below, *see* Md. Rule 8–131(a), and need not address how a court should approach the issue of collateral estoppel, should such an issue arise in future proceedings.

exists to support an automatic finding that every social securi-
ty disability recipient completely lacks the capacity to work or
earn any income in the absence of the opposing party's ability
to produce clear and convincing evidence to the contrary.
Therefore, the burden of proving such a disability logically
remains with the party alleging the disability.

To be sure, an evaluation of our sister jurisdictions encoun-
tering the issue raised in the case *sub judice* demonstrates
that a majority have concluded similarly. *Knope v. Knope,*
103 A.D.3d 1256, 959 N.Y.S.2d 784, 786 (2013) (concluding that
" '[a] decision of the Social Security Administration [may
serve] as some evidence' of a disability, but it is not *prima
facie* evidence thereof") (citation omitted); *Gilligan v. Gilli-
gan,* 428 N.J.Super. 69, 50 A.3d 110, 112 (Ch.2012) (holding
that a Social Security Administration disability award is not
"automatically sufficient for the family court to conclude that
the party cannot work in any capacity or earn any income"
and that a "party must provide more evidence to the court
than simply the [disability] award letter itself to prove his or
her case."); *In re Marriage of Smith,* 2012 IL App (2d)
110522, 367 Ill.Dec. 435, 981 N.E.2d 1163, 1165, 1172–73 (2012)
(determining that even if the parties stipulate that one is
"disabled and receiving Social Security benefits" it does not
preclude the court from finding that the party claiming the
disability is not permanently disabled and incapable of being
employed in some capacity); *Lucas v. Lucas,* 88 Conn.App.
246, 869 A.2d 239, 250 (2005) ("A finding by the Social Security
Administration that the [party] is disabled for purposes of
social security disability benefits does not preempt a court
from making its own independent determination concerning
the defendant's ability to work[,]" when no "credible evidence"
of disability or the lack of ability to earn income was offered);
*Tevolini v. Tevolini,* 66 Conn.App. 16, 783 A.2d 1157, 1164,
1166 (2001) (noting that the claimant offered no evidence of
her disability other than receipt of her social security disabili-
ty benefits and her testimony, and ultimately concluding that
"it was incumbent on her to offer pertinent evidence to
support her position."); *Wilde v. Wilde,* 35 P.3d 341, 348 (Utah

Ct.App.2001) (observing that an SSA determination alone does not establish that the allegedly disabled party was unable to contribute to her own support). *But see Barnes v. Ivy,* 353 S.W.3d 324, 333 (Ky.2011) (holding that a court is not free to disregard the Social Security Administration's determination that a party is disabled and that if child support is to be demanded from the disability beneficiary "there must be evidence clearly establishing the recipient's ability to work or the recipient's ability to afford the support payment."); *Kronforst v. Kronforst,* 21 Wis.2d 54, 123 N.W.2d 528, 534 (1963) (noting briefly that a "presumption exists that the [SSA] would not have certified a fifty-two year old [man] for disability benefits unless he had met the conditions specified in the foregoing definition[,]" therefore making his present disability indefinite in duration).

We do not foreclose the possibility, however, of instances where the party alleging the disability and inability to work is readily apparent, without the need for expert testimony and extensive medical reports. But such apparent impairment is not present in the instant case. Indeed, the circuit court expressed doubts regarding the extent of Melissa's impairment:

> ... [T]here is evidence in the record that, such as the credit card statements that show that [she] does not stay in bed all day as she claims, that she can shop and there is evidence she can exercise, evidence that she can hike, evidence that she picks up a three year old and changes his diaper, and changes him and the [c]ourt's observation that she was able to communicate effectively with counsel during these proceedings, take notes, receive note from her sister who was sitting in the back, in the courtroom, and communicate effectively with counsel without any seeming difficulty ....

Further, the SSA letters Melissa submitted to the circuit court provided no insight regarding the nature, extent, severity, or permanence of her physical or mental impairment. Although the letters indicated that the SSA found Melissa disabled "under [its] rules," they neither provided any basis for the SSA's determination of disability nor any reasoning to support

the award of disability benefits. As a consequence, Melissa was required to submit evidence corroborating a complete inability to work, such as substantiating medical records and expert testimony. This requirement is synonymous with the burden of proof the SSA places upon an allegedly disabled claimant in a social security disability proceeding. *See* 20 C.F.R. §§ 404.1501(c) (2012),[17] 404.1512 *et seq.* (2012),[18] & 404.1513 (2012);[19] *Gilligan,* 50 A.3d at 118. *See also Bowen*

---

**17.** 20 C.F.R. § 404.1501 provides how the SSA determines whether an applicant is disabled, noting that "Sections 404.1512 through 404.1518 contain [the SSA's] rules on evidence," in which the provisions "explain [an applicant's] responsibilities for submitting evidence of [his or her] impairment, state what [the SSA] consider to be acceptable sources of medical evidence, and describe what information should be included in the medical reports." *Id.* § 404.1501(c).

**18.** Title 20, Section 404.1512 of the Code of Federal Regulations outlines the evidence a claimant must submit to the SSA for a determination of disability, and provides in pertinent part:
(a) General. In general, you have to prove to use that you are . . . disabled. Therefore, you must bring our attention everything that shows that you are . . . disabled. This means that you must furnish medical and other evidence that we can use to reach our conclusions about your medical impairment(s) and, if material to the determination of whether you are disabled, its effect on your ability to work on a sustained basis. We will consider only impairment(s) you say you have or about which we receive evidence.
(b) What we mean by "evidence." Evidence is anything you or anyone else submits to us or that we obtain that relates to your claim. This includes, but is not limited to:
(1) Objective medical evidence, that is, medical signs and laboratory findings as defined in § 404.1528(b) and (c);
(2) Other evidence from medical sources, such as medical history, opinions, and statements about treatment you have received;
(3) Statements you or others make about your impairment(s), your restrictions, your daily activities, your efforts to work, or any other relevant statements you make to medical sources during the course of examination or treatment, or to us during interviews, on applications, in letters, and in testimony in our administrative proceedings;
(4) Information from other sources, as described in § 404.1513(d);
(5) Decisions by any governmental or nongovernmental agency about whether you are disabled . . . .
20 C.F.R. § 404.1512(a) & (b)(1)-(b)(5).

**19.** Title 20, Section 404.1513 of the Code of Federal Regulations outlines the acceptable medical sources and reports a claimant may use to establish the nature, extent, severity, and permanency of his or her impairment. 20 C.F.R. § 404.1513

*v. Yuckert,* 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (noting that "[i]t is not unreasonable to require the claimant, who is in a better position to provide information about his [or her] own medical condition, to do so.").

As observed, *supra,* Melissa produced only three letters from the SSA indicating an award of disability benefits, her own testimony, and no medical evidence of any kind. While the SSA letters are relevant evidence, *see Knope,* 959 N.Y.S.2d at 785–86, "it is premature at best to attempt to reach conclusions about the nature of [Melissa's] disability and [her] capacity to work[.]" *Gilligan,* 50 A.3d at 119. We therefore conclude that the circuit court erred in finding Melissa totally and permanently disabled and incapable of working because she failed to satisfy her requisite burden of proof. Since the circuit court predicated Melissa's award of indefinite alimony pursuant to Md.Code (1984, 2012 Repl.Vol.), § 11–106(c) of the Family Law Article,[20] we accordingly vacate the circuit court's judgment of indefinite alimony and remand for further findings and considerations consistent with this opinion.

On remand, the circuit court should permit both parties to present additional evidence to support and/or refute Melissa's claim of total and permanent disability. If after reviewing all the propounded evidence the court determines that Melissa has met her burden of proof, and is, in fact, completely unable to work in any capacity (even below the substantial gainful activity threshold permitted by the SSA), *see* Md.Code (1984, 2012 Repl.Vol.), § 11–106(c)(1) of the Family Law Article, or determines that even after she makes "as much progress toward becoming self-supporting as can reasonably be expected [and] the respective standards of living [between] the parties will be unconscionably disparate," *see id.* § 11–106(c)(2), then the court may exercise its sound discretion in awarding indefinite alimony.

---

20. *See* note 14, *supra.*

**(B)** WHETHER THE CIRCUIT COURT ERRED IN GRANTING MELIS-SA A MONETARY AWARD AND ERRED IN DENYING MELISSA'S REQUEST FOR A FINDING OF DISSIPATION OF MARITAL PROPERTY.

Gary contends that the circuit court's judgment granting Melissa a monetary award must be vacated for three reasons. First, Gary argues that the factors underlying alimony and monetary awards are so interrelated that when this Court vacates an award for the former, we often vacate the latter for re-evaluation. Second, Gary contends that the circuit court erred "in making a double award of the marital home and Delaware property" to Melissa. He asserts that the court "awarded [Melissa] on[e] half of the excess value from [Gary's] equity in reaching the sum of $88,848[,] which included the value of the two properties, plus ordered the two properties sold and the proceeds split, thus giving [Melissa] the equiva-lent of the full value of both of the properties." Third, he argues that the court erred in ordering that the Delaware property be sold because the court does not maintain "the right to divest other non-party owners of property by ordering a sale of the property without them having been joined as interested persons." He insists that this ruling erroneously "allowed [Melissa] to obtain a sale in lieu of partition without joining all of the required parties in a State where the property is not located."

Conversely, Melissa counters that the circuit court "did not abuse [its] discretion in granting a marital award[.]" She additionally insists that "[w]hether the [circuit court] had the authority to order the sale of the Delaware property is a moot point[,]" because the entry of the judgment of divorce ren-dered Gary and her "tenants in common in relation to the Delaware property[,]" providing her the "right to file for sale in lieu of partition." Nonetheless, she asserts that the circuit court's failure to find that Gary had wrongfully dissipated $40,000 of the parties' marital assets following the filing of her complaint for absolute divorce and to award her the value of the alleged extant property was clear error.

We agree with Gary's first assertion that the factors underlying alimony and monetary awards are so interrelated that we must also vacate the circuit court's judgment granting Melissa a monetary award. We shall nevertheless address both parties' contentions, *infra*, to the extent that it provides guidance to the circuit court on remand. We elect to do so, however, in reverse order.

### (1) The Circuit Court Committed No Error In Concluding That Gary Had Not Wrongfully Dissipated Marital Property.

We begin by addressing Melissa's argument that the circuit court erred when it failed to find that Gary had wrongly dissipated $40,000 of the parties' marital assets. At the outset, we acknowledge that it is axiomatic that "[m]arital property means property, however titled, acquired by [one] or both parties during the marriage." Md.Code (1984, 2012 Repl.Vol.), § 8-201(e)(1) of the Family Law Article, *quoted in Reichert v. Hornbeck,* 210 Md.App. 282, 349, 63 A.3d 76 (2013). *See also Williams v. Williams,* 71 Md.App. 22, 34, 523 A.2d 1025 (1987); *Campolattaro v. Campolattaro,* 66 Md.App. 68, 81, 502 A.2d 1068 (1986). Therefore, " '[p]roperty acquired by a party up to the date of the divorce, even though the parties are separated is marital property.' " *Reichert,* 210 Md.App. at 349, 63 A.3d 76 (quoting *Williams,* 71 Md.App. at 34, 523 A.2d 1025). But as this Court has observed on many occasions,

> . . . marital property which generates a monetary award must ordinarily exist as "marital property" as of the date of the final decree of divorce based on evidence adduced at the trial on the merits or a continuation thereof. Therefore, property disposed of before commencement of the trial under most circumstances cannot be marital property.

*Gravenstine v. Gravenstine,* 58 Md.App. 158, 177, 472 A.2d 1001 (1984), *quoted in Reichert,* 210 Md.App. at 349, 63 A.3d 76. *See also Williams,* 71 Md.App. at 34, 523 A.2d 1025. There is, however, one exception to this general principle. It "exists under circumstances of wrongful dissipation of the

parties' marital property." *Reichert,* 210 Md.App. at 349–50, 63 A.3d 76.

■■ Wrongful dissipation occurs when one spouse uses marital property for his or her own benefit for purposes unrelated to the marriage, at a time when the marriage is undergoing an irreconcilable breakdown. *Id.* at 350, 63 A.3d 76 (quoting *Sharp v. Sharp,* 58 Md.App. 386, 401, 473 A.2d 499 (1984)). It matters not, however, that one spouse has, post-separation, expended some of the marital assets. *Heger v. Heger,* 184 Md.App. 83, 96, 964 A.2d 258 (2009). But what is critically important is the *purpose* behind the expenditure. *Id.*

■■■ Both the burden of persuasion and the initial burden of production for demonstrating an act of wrongful dissipation are on the party making the allegation. *Jeffcoat v. Jeffcoat,* 102 Md.App. 301, 311, 649 A.2d 1137 (1994) (citing *Choate v. Choate,* 97 Md.App. 347, 366, 629 A.2d 1304 (1993)). *See also Simonds v. Simonds,* 165 Md.App. 591, 614–15, 886 A.2d 158 (2005). The burden of persuasion remains with the party alleging the dissipation until he or she "establishes a *prima facie* case that the monies have been dissipated, i.e., **expended for the principal purpose of reducing the funds available for equitable distribution[.]**" *Jeffcoat,* 102 Md. App. at 311, 649 A.2d 1137 (emphasis added). Thereafter, the burden shifts to the party who spent the money to produce evidence sufficient to show that the expenditures were appropriate. *Id.* at 311, 649 A.2d 1137.

■■■ Nonetheless, "the ultimate burden of persuasion remains on the party who claims that the other party has dissipated the marital assets." *Omayaka v. Omayaka,* 417 Md. 643, 656, 12 A.3d 96 (2011), *quoted in Reichert, supra,* 210 Md.App. at 353, 63 A.3d 76. Therefore, although either party is entitled to argue that his or her opponent's explanation of certain dissipated marital funds was unreasonable, "the circuit court maintain[s] no requirement to accept the [alleging party's] argument because it [is] within the circuit court's discretion to determine which evidence offered [is] the 'better'

evidence." *Reichert,* 210 Md.App. at 353, 63 A.3d 76. It accordingly follows, that

> [w]hen a party attempts to prove a particular point by presenting evidence that is less clear, less direct, less reliable and/or less satisfactory than other evidence available to that party, the trier of fact is permitted—but not required—to find that the "better" evidence "would have been detrimental to [that party] and would have laid open deficiencies in, and objections to [that party's] case which the more obscure and uncertain evidence did not disclose."

*Omayaka,* 417 Md. at 657 n. 4, 12 A.3d 96 (quoting *Loyal Protective Ins. Co. v. Shoemaker,* 178 Okla. 612, 63 P.2d 960, 963 (1936)) (additional citations omitted) (textual addition in *Omayaka, supra,* 417 Md. at 657 n. 4, 12 A.3d 96). Thus, the circuit court is entitled to accept or reject any portion of the testimony of a witness because dissipation is a clear question of fact. *Reichert,* 210 Md.App. at 354, 63 A.3d 76 (citing *Omayaka,* 417 Md. at 658, 12 A.3d 96). In that regard, we find instructive the Court of Appeals decision in *Omayaka v. Omayaka,* 417 Md. 643, 12 A.3d 96 (2011).

In *Omayaka,* the plaintiff ("wife") filed a complaint for divorce on grounds of voluntary separation. 417 Md. at 647, 12 A.3d 96. The defendant ("husband") denied that he and his wife had ever agreed to voluntarily live apart for the statutory period required for a divorce by voluntary separation. *Id.* In addition, he further submitted a counterclaim for absolute divorce alleging in "count II" of his counter-complaint that his wife had dissipated the parties' marital assets. *Id.* Specifically, the husband, in part, asserted:

> COUNT II DISSIPATION OF MARITAL ASSETS 11. [The husband] did refinance the marital home. Pursuant to an agreement between the parties, [the wife]'s counsel was to place her share of the proceeds in an escrow account until she had accounted for the transfer of marital funds in the amount of $80,000[ ]. By a June 13th 2006 communication, the parties understood that [the wife]'s counsel was to release all but $40,000[ ] to her and would provide an accounting of what, if anything, was taken and how the

marital money was spent. To date[,] no such accounting has been provided.

12. [The wife] has clearly dissipated the marital funds, these funds were transferred during the pendency of litigation and not spent for any family use purposes. Indeed some of these funds were wired to an overseas bank account and/or [to] persons that [the husband] is not aware of or was privy to.

*Id.* at 647–48, 12 A.3d 96.

During trial before the Circuit Court for Prince George's County, the defendant called his wife as his first witness regarding his counterclaim for absolute divorce. *Id.* at 648, 12 A.3d 96. The wife's testimony included two concessions: "that (1) while married to [her husband], she opened two bank accounts in her name only, and (2) from March of 2005 through December of that year, she made 'over the counter' withdrawals of approximately $80,000[ ] from those accounts." *Id.* at 648–49, 12 A.3d 96. The wife, however, denied the allegations of dissipation, attesting that when she and the defendant lived together "each one of [them] had [their] own account[s]. So the way [she] spent [her] money, [she] spent [her] money, and he just spent his own money." *Id.* at 649, 12 A.3d 96. She further explained that "[t]he only joint account that [they] had [was] where [they] used to pay [their] bills." *Id.*

At the conclusion of the trial, the circuit court granted the wife an absolute divorce and denied the husband's counterclaim for dissipation, noting that he had failed to meet his burdens of production and persuasion. *Id.* 649–51, 12 A.3d 96. The husband protested the court's conclusion, arguing, "Your Honor, . . . for dissipation—You're putting all the burden on us." *Id.* at 650, 12 A.3d 96. The circuit court responded, indicating:

I think I just explained that I did not believe that you had made a case. That's not a "prima facie" case. We are at the conclusion of all of the evidence. So it's not a question of a "prima facie" case. The question is, did he meet the

burden? And I suggested that he didn't meet the threshold question. And then I went on to say that even accepting that he did meet it, then the next question is, does she explain adequately where the funds went? And I found that she had.

*Id.* at 650–51, 12 A.3d 96. Thereafter, the following colloquy ensued:

[The husband's counsel]: But she didn't put on any evidence, Your Honor, about how the money was spent.

THE COURT: She did. She said that she spent it on her credit cards, her $5,000 loan, her clothing, food, mortgage, sent to the other two children; she went through the whole litany of that.

[The husband's counsel]: . . . There's no evidence in the record that she spent the money for what she said.

THE COURT: There is evidence. I heard her say so under oath from the stand.

[The husband's counsel]: There's no corroborating evidence, Your Honor.

THE COURT: I don't recall in the [C]ode where the testimony needs to be corroborated. If you can give me a case that requires that, I'll be happy to look at it.

*Id.* at 651, 12 A.3d 96. The husband consequently noted an appeal to this Court. *Id.* at 646, 12 A.3d 96. Before argument, however, the Court of Appeals issued a writ of certiorari on its own initiative to address the parties' contentions regarding a dissipation arguments' burden of persuasion and production. *Id.*

After reviewing the parties' contentions on appeal, the Court of Appeals began its analysis observing that "[i]f there is any competent evidence to support the factual findings below, those findings cannot be held to be clearly erroneous," because the circuit court's judgment regarding dissipation is solely a factual one. *Id.* at 653, 12 A.3d 96 (quoting *Fuge v. Fuge*, 146 Md.App. 142, 180, 806 A.2d 716 (2002)). The Court further reasoned that when the circuit court is called to assess the credibility of witnesses, the court is "entitled to accept—or

reject—*all, part,* or *none* of the testimony of any witness, whether that testimony was or was not contradicted or corroborated by any other evidence." *Id.* at 659, 12 A.3d 96 (emphasis in original). Specifically, the Court noted:

> ... [T]he [c]ircuit [c]ourt expressly found that "here has been evidence presented that [the wife] spent substantial sums of money during the marriage[.]" If that evidence had been presented through the testimony of other witnesses, or if [the husband] had not questioned [the wife] about how she spent the money, there would be merit in [the husband's] argument that he "made out a prima facie case of dissipation[.]" [The husband], however, elected to question [the wife] about how she spent the funds that she withdrew from her bank accounts in 2005, thereby presenting the [c]ircuit [c]ourt with both (1) evidence of the withdrawals, and (2) [the wife's] explanation of what she did with the money. **While [the husband] was certainly entitled to argue that [the wife's] explanation was unworthy of belief, the [c]ircuit [c]ourt was not required to agree with that argument.**

*Id.* at 657, 12 A.3d 96 (emphasis added) (footnote omitted). Therefore, the Court concluded that the circuit court's finding was not clearly erroneous because it was entitled to find that the wife had adequately explained where the withdrawn funds from her bank accounts had gone. *Id.* at 659, 12 A.3d 96.

The general principles imparted by the Court of Appeals, *supra,* are applicable and particularly germane to our analysis in the case at bar. Much like the husband in *Omayaka,* Melissa merely presented general allegations of wrongful dissipation. *Cf. Omayaka,* 417 Md. at 647–48, 657, 12 A.3d 96. Gary acknowledged he had withdrawn the funds, additionally explaining that he used the money to pay his attorney's fees and living expenses while he was unemployed. The circuit court was at liberty to believe his explanation. As this Court noted in *Bricker v. Warch,* 152 Md.App. 119, 831 A.2d 453 (2003):

> Although it is not uncommon for a fact finding judge to be clearly erroneous when he [or she] is affirmatively **PER-**

SUADED of something, it is, as in this case, almost impossible for a judge to be clearly erroneous when he [or she] is simply **NOT PERSUADED** of something.

*Id.* at 137, 831 A.2d 453 (emphasis in original), *quoted in Omayaka,* 417 Md. at 658–59, 12 A.3d 96. We accordingly conclude that the circuit court committed no error in its findings regarding Melissa's allegations of dissipation.

### (2) Gary's Contentions Regarding the Circuit Court's Judgment Granting Melissa A Monetary Award of $88,848.50 Are Misconceived.

As observed in Part I, *supra,* Gary filed two motions for new trial. In his amended motion for new trial, Gary requested that the circuit court transfer Melissa's interest in both the marital home and Delaware property to him and that Melissa be provided with an adjusted monetary award of $85,000. He reiterated these arguments during the court's November 10, 2011, hearing. The particulars of his assertions were presented in the following dialogue:

[Gary's counsel]: Your Honor, there were several issues raised in the, in the [A]mended [M]otion and I will try to go through it as expeditiously as possible. **The first contention that we have is that there is a parcel of real property which was Bryn Mawr in Delaware. The major issue and problem we had with that is, as the [c]ourt recalls, that was a parcel of real property that was, my client had a tenant in common interest with two of his brothers. It is of now [sic], there was a [d]eed that of the one-third interest of my client's, [Melissa] had a half interest to that one-third interest. The problem that we have, Your Honor, as you recall, is you ordered that property to be sold and, Your Honor, we believe that, based upon some of the citations in the [a]mended [m]otion for [n]ew [t]rial, that is strictly in the face of—**

[THE COURT]: **Well, to be, to be clear[,] what I ordered was their one-third interest to be sold.**

[Gary's counsel]: Well, I don't see how that could be done without the entire parcel of property being sold.

[THE COURT]: Okay.

[Gary's counsel]: And so, therefore, Your Honor, what we are asking for the [c]ourt to do is, well, let me go back. **The reason we think that's a problem, Your Honor, is that the two other individuals who are on that [d]eed and who have a right and a right to be here and have notice and to have hearing [sic], that potentially [sic] property which they had an interest in could be affected. They were never given notice whatsoever about this hearing. They never had the opportunity to be heard and to have their own input as to it. So, therefore, Your Honor, I think simple argument as to due process would indicate that that [sic] is completely incorrect for the [c]ourt to order the sale of that property without putting those other property owners on notice. In my [a]mended [m]otion for [n]ew [t]rial, I raised several provisions of the Courts and Judicial Proceedings and other sections of Maryland Rules when the [c]ourt[ ]s order sales of their property and one of the common themes within those provisions is that parties that may be affected would have notice, whether it be by judicial notice of, outside of the courthouse steps, whether it be some type of notice so that they would have the opportunity to be heard. Here the two other individuals who had property at stake at [sic] this, had absolutely no notice.** I'm asking the [c]ourt and I believe that a new trial would be appropriate because while we understand that [Melissa] does have an interest in the property, we believe that it should be obtained through a marital award, not neces-sar[ily] through the forced sale of that property. The [c]ourt, at trial, determined that the value of the property that was $200,000. It was agreed that the lien at that time was $142,000. Because the three property owners each had an approximate, and I'm using [an] approximate number right now, interest of $20,000 each, we believe that [Melissa] should be awarded a monetary award for her half interest in the one-third interest in the property. We think that [sic] that's certainly reasonable and it also permits the [c]ourt to,

to change or fix the issue about ordering a parcel of property, without giving due process rights to other individuals who are affected. That is reason number one—

[THE COURT]: So your, your position is the marital award should be increased by $10,000?

[Gary's counsel]: That, that's what we think should happen with that particular portion, yes.

[THE COURT]: All right. But you don't need a new trial for that.

\* \* \*

[Gary's counsel]: Okay. Yeah, I mean, potentially, okay, okay. Your Honor, number two, the second issue would be as it relates to the monetary award itself in this case. Your Honor, you awarded a monetary award of $88,848.50. Your Honor, I have before you the joint marital property statement, and this is going to take some math as to why we think the accounting done in this case was fundamentally flawed and I'll start with this.

\* \* \*

[Gary's counsel]: ... This [c]ourt, in essence, ordered that those cash accounts be split in half and, Your Honor, I think with the evidence that was presented that day, splitting in half is, in essence allowing [Melissa] to receive three-fourths of all marital monies that they had and giving [Gary] one-fourth interest. And my analysis is such. It was agreed and not controverted that in 2005 the parties had approximately $200,000 together. That's not disputed. It's also not disputed that when she left in 2005, she took a hundred and approximately four thousand dollars. That's also not disputed. It's also not disputed that she received in 2009 a social security disability benefit award of $53,000 which it's not disputed that [sic] that also is marital monies. Of that $157,000 that was awarded, that was, [Melissa] received, [Gary] was credited with zero of that, with absolutely nothing. Now, with the $104,000 that she received, which left [Gary] with $104,000, in 2005, that, in essence, split the marital funds at that point. All the cash they had was split

right down the middle in 2005. In 2011, we come before Your Honor, you, in essence, split it again and said down the middle, fifty/fifty, which brings me to my original point of that, in essence, leaves [sic] that [Melissa] is walking away with three-fourths of the monies that they had acquired together and [Gary] is, in essence, being awarded one-fourth of that, those monies. And so, Your Honor, we believe that the $88,000, because of the lack of consideration that my client was at a deficiency of approximately $4,500 for the items that I spoke to previously, coupled with the complete lack of accounting for the $157,000 that [Melissa] received, bears that the actual number that the marital award should have been, would be substantially less, substantially less. Your Honor, we are asking that of the $157,000 that she had, which [Gary] had absolutely no credit for, we believe that [sic] that $157,000 can be apportioned to [Gary] which would substantially reduce the marital, monetary award, marital award. Your Honor, we are asking that the $88,000, as a result of the hundred and four she took and the fifty-three, be reduced to zero because she received her half already. She already got that and so, Your Honor, we are saying that the $88,000 for that reason, for those, the marital award there was incorrect. Now, for the, and this is where it may get confusing because we are going to be asking for a separate monetary award to [Melissa] in the amount of $75,000 and here's the confusing part of that. The 5210 Wilkins Avene [address] is the home that [Gary] has been residing in for as long as he can remember.

*    *    *

[Gary's counsel]: . . . as it pertains to Wilkins Avenue, it was undisputed that [Melissa] left the home in 2005 and it's undisputed that she made zero contributions towards the marital home. It was undisputed at trial that there was a fair market value of $150,000. It is also undisputed that when [Melissa], at the time of trial, was gifted a home, which she owned free and clear and clearly had a place already to live. Your Honor, we asked that this [c]ourt transfer ownership to my client and we ask that a marital

award be awarded to [Melissa] for her equitable interest in that property. Part of the basis as to why we believe that was fair was, part of it was an equity argument that [Gary] had no residence. This is an example where there was no lien against the home and this was an example where equity would have allowed that this property be transferred to [Gary] and [Melissa] be awarded her equitable share of the property. This was a property that [Gary] has maintained and has been the only person who has been paying on this property and, frankly, fairness dictates that he has nowhere else to go at this point and for him to have to now go purchase another property, would require him to sink a fair amount of his money, remaining monies into a piece of real property. So we would be asking as part of our request that the Wilkins Avenue address be transferred to [Gary] and [Melissa] be awarded her appropriate equitable share of that, which would be $75,000. So we would be asking that the marital award, or monetary award, actually be $85,000 for the transfer of those two pieces of property . . . .

(emphasis added). The circuit court held its ruling *sub curia* and ultimately denied Gary's above-mentioned requests.

Before this Court, Gary contends that the circuit court erred in "factor[ing] into its calculation all of the property listed on the [j]oint [p]roperty [s]tatement" for two reasons. First, Gary contends that the circuit court erred "in making a double award of the marital home and Delaware property" to Melissa. He asserts that the court "awarded [Melissa] on[e] half of the excess value from [Gary's] equity in reaching the sum of $88,848[,] which included the value of the two properties, plus ordered the two properties sold and the proceeds split, thus giving [Melissa] the equivalent of the full value of both of the properties." Second, he argues that the circuit court erred in ordering that the Delaware property be sold because the court does not maintain "the right to divest other non-party owners of property by ordering a sale of the property without them having been joined as interested persons."

Gary's first reason assigning error to the judgment granting a monetary award to Melissa is unpreserved. Regarding Gary's second contention assigning error to Melissa's monetary award, we conclude that the argument is without merit. In his brief, Gary incorrectly frames the circuit court's judgment ordering the sale of the parties' *one-third interest* in the Delaware property as being an order for the sale of all interests in the property, divesting the other tenants in common of their interests. Notwithstanding Gary's assertion, the circuit court clearly limited the sale of the Delaware property to the one-third interest Melissa and Gary held as tenants by the entirety:

> ... I am going to order that the tenants by the entireties property at 5210 ½ Wilkins Avenue be sold and the proceedings distributed equally to the parties. **I'm going to order that the one-third interest in the, one third tenants by the entireties interest in the Delaware property also be sold,** by a trustee's sale, both of them ....

(emphasis added). Indeed, the circuit court reiterated the parameters of the order during the hearing of November 10, 2011. This judicial sale was well within the authority of the circuit court. *Cf. Fagnani v. Fisher,* 418 Md. 371, 378, 15 A.3d 282 (2011). "A tenancy in common is a relationship among owners of property. It is created where several persons concurrently hold an estate in land by several and distinct titles with only a unity of possession," *Beesley v. Hanish,* 70 Md.App. 482, 490, 521 A.2d 1235 (1987) (citing 2 Tiffany, *Real Property* § 426 (3d. ed. 1939, 1986 Cum.Supp.)). Those co-tenants within the tenancy in common are equally entitled to the use, benefit and possession of the whole common property so long as one tenant does not prejudice the rights of the others without unanimous consent. *Id.* at 491–92, 521 A.2d 1235. Nonetheless, sale of an undivided interest in the tenancy in common, however, is not prohibited so long as it does not prejudice the right to use and enjoyment of the other co-tenants because "[a]ny person who purchases a share of the tenancy in common becomes a co-tenant with the other

owners." *Id.* (citing 86 C.J.S. *Tenancy in Common* § 8b (1954)).

In the instant case, there was no evidence to support a finding that sale of the one-third undivided interest would prejudice the rights of Melissa and Gary's co-tenants. Consequently, we find no error in ordering sale of the one-third undivided interest in the Delaware property.

### (C) WHETHER THE CIRCUIT COURT ABUSED ITS DISCRETION IN AWARDING ATTORNEY'S FEES IN THE AMOUNT OF $10,000.

This Court noted *in Doser v. Doser,* 106 Md.App. 329, 664 A.2d 453 (1995), that:

> [t]he factors underlying awards of alimony, monetary award, and counsel fees are so interrelated that, when a trial court considers a claim for any one of them, it must weigh the award of any other. Accordingly, when this Court vacates one such award, we often vacate the remaining awards for reevaluation.

106 Md.App. at 335–36 n. 1, 664 A.2d 453 (internal citations omitted), *quoted in Kelly,* 153 Md.App. at 279–80, 836 A.2d 695 (2003). Therefore, we shall vacate the award of attorney's fees since we are also vacating and remanding this case regarding the issues of alimony and a monetary award. On remand, the circuit court must reconsider whether Melissa is entitled to contribution toward her attorney's fees in light of our discussions of law with respect to the other issues, pursuant to Md.Code (1984, 2012 Repl.Vol.), §§ 11–110(b) & (c) of the Family Law Article.[21]

---

**21.** Section 11–110 of the Family Law Article, provides in pertinent part:
(b) *Authority of court.*—At any point in a proceeding under this title, the court may order either party to pay to the other party an amount for the reasonable and necessary expense of prosecuting or defending the proceeding.
(c) *Required considerations.*—Before ordering the payment, the court should consider:
  (1) the financial resources and financial needs of both parties; and
  (2) whether there was substantial justification for prosecuting or defending the proceeding.

JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE COUNTY IS AFFIRMED IN PART AND VACAT-ED IN PART. CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.

Md.Code (1984, 2012 Repl.Vol.), §§ 11–110(b) & (c) (emphasis in original).