**REPORTED**

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 327

September Term, 2015

_____

LAUREN ST. CYR

v.

MARK ST. CYR

_____

Wright,
Arthur,
Reed,

JJ.

_____

Opinion by Arthur, J.

_____

Filed:  June 1, 2016

*This is an unreported opinion, and it may not be cited in any paper, brief, motion, or other document filed in this Court or any other Maryland Court as either precedent within the rule of stare decisis or as persuasive authority.  Md. Rule 1-104.

In a divorce judgment, the Circuit Court for Harford County ordered Mark St. Cyr ("Husband") to pay child support and rehabilitative alimony to Lauren St. Cyr ("Wife"). The court also granted Wife use and possession of the family home for several months.

On appeal, Wife challenges the court's factual findings as to her potential income, the court's exercise of discretion in determining the amount and duration of alimony, and the court's exercise of discretion in determining the time limit for use and possession of the family home. Although we leave many of the court's findings and rulings undisturbed, we vacate the judgment in part and remand so that the court may re-evaluate the alimony award.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Marriage and its Demise

The parties to this case were married in 1994. Before the marriage, Wife worked as an assistant branch manager at a surety company, earning around $45,000 per year. She stopped working in 1995, upon the birth of the family's first child, a daughter. Another daughter was born in 1997, followed by a son in 1999. Wife served as primary caregiver to the children.

During most of the marriage, Husband served as the family's sole wage earner. In the first year of the marriage, he earned less than Wife. His income gradually increased as his career in sales and distribution progressed. In 2000, Husband started working in a management position.

During the marriage, Husband and Wife consumed nearly all of their household

income, saving little. They lived in a house that tested the extent of their means.[1] In 2004, they nearly lost the home to foreclosure. Wife did not return to work at that time. Instead, Husband sold the house to a lender, rented it from the lender for two years, and repurchased it at a substantially higher price. When he fell delinquent on mortgage payments again in 2010, he negotiated a loan modification that allowed him to make payments at a temporary interest rate of two percent, subject to sharp annual increases beginning in March 2015.

In 2009, Wife was diagnosed with Hodgkin's lymphoma. She underwent chemotherapy and bone marrow extraction, and her cancer went into remission. Husband provided little emotional support during this time of medical need.

In the fall of 2011 at the latest, Husband started an extramarital affair. Wife learned of the relationship, but agreed to attempt to reconcile with Husband after he denied that the relationship was sexual. For several months, Husband lived in the family home on many nights, while secretly spending other nights with another woman at an apartment that he had rented.

Wife eventually learned of her husband's deception. In September 2012, the parties separated permanently. Husband did not return to the family home.

## B.    The Divorce Action

On July 1, 2013, Husband filed a complaint for absolute divorce in the Circuit

---

[1] The circuit court described the house as a "4-bedroom, 3½-bath brick-faced colonial in the Fox Chase neighborhood" of Bel Air, located in the C. Milton Wright High School district. In the parties' joint financial statement, they estimated the house's fair market value at $500,000, with a total lien of $389,701 from two mortgages.

Court for Harford County. He asked the court to grant him sole legal custody and shared physical custody of the parties' minor children.

Wife counterclaimed for divorce, sole legal custody and primary physical custody of the minor children, alimony, child support, equitable division of marital property, use and possession of the family home and family-use personal property, and counsel fees.

Adopting a master's report and recommendation, the circuit court issued a pendente lite order that granted Wife use and possession of the family home and required Husband to continue paying the mortgage (approximately $2,850 per month). In addition, the order required Husband to pay alimony and child support for the two minor children.

Wife later amended and supplemented her pleadings, asking the court to transfer title of the family home to her and to declare the couples' oldest child to be a destitute adult child for support purposes.

### C.    Trial in the Circuit Court

The court heard the case on five trial days between September 22, 2014, and October 6, 2014. Much of the testimony concerned the parties' financial circumstances.

At the time of trial, Husband was 46 years old with an extensive work history. He earned in excess of $200,000 in annual salary and bonuses in an executive or management position. On the other hand, Wife, at the age of 47, had not been employed for nearly two decades. A central issue was whether she was capable of re-entering the workforce.

Husband testified that Wife had decided that she did not want to return to work

after the birth of their first child and that he had supported that decision while the children were young. According to Husband, he asked his wife to contribute financially when they faced the threat of foreclosure in 2004, but she maintained that she was "never going back to work." He testified that, at other times when he brought up the possibility of bringing a second income to the household, she would respond that there was "no way" that she would resume working. He admitted that his wife sometimes slept excessively when she was experiencing health problems during the later years of the marriage. He had observed that she had always been able to wake up in the morning "if she needed to" to attend to the needs of the children.

According to Wife, she and her husband mutually decided that she would be a stay-at-home mother so that the family could follow Husband's career path. During cross-examination, Wife stated that she believed that Husband should continue to bear sole financial responsibility for the family after the separation: "That is what we signed up for. . . . That is his responsibility[.]" She added: "From the very onset of the marriage, the agreement that Mark and I set forth was Mark would be the person who was the breadwinner in the family, that was extremely clear, and I would be the one raising the children." When counsel asked more specifically about her future expectations of support, she answered: "I expect Mark to fulfill the duties that he said that he would twenty years ago."

Regarding her physical condition, Wife testified that she began to experience chronic fatigue around 2007. At the time of her cancer diagnosis in 2009, she also tested positive for mononucleosis, which she characterized as "the cause of the fatigue." Wife

testified that, after learning of her husband's affair, she underwent therapy at the instructions of her doctors. She reported that she was currently taking an antidepressant, a mood stabilizer, thyroid medication, and blood pressure medication. She stated that her cancer was in remission at the time, but that she suffered from neuropathy in her hands and feet as a result of her chemotherapy.

At the time of trial, Wife did not believe that she would be able to resume employment. She said that she was still physically weak and continued to experience episodes of depression. Regarding her daily functioning, she stated: "I have to pace myself. I know I can't go out for twelve hours in a day. I know I can't do a ten hour day."

In response to a question about her future employment capacity, she answered:

It depends on what my doctors suggest. . . . I'm in constant contact with them. I still have a few months left in remission. Right now, based on the limited amount of energy that I have to pace myself during the day, I don't believe that I would be able to perform a full day's work that would be required by any employer. So, I would have to consult with my doctors. Maybe in November this year we'll see if things have improved healthwise.

Nonetheless, Wife testified that her fatigue had not prevented her from involving herself heavily in her children's activities. She opined that her level of activity outside the home was "a little different than working full-time" and not "a twelve hour day," which she said was "typically how long you work when you're working in a corporate world." She stated that she needed "to pace [her]self" and she "wish[ed] that [she] had more energy to do some things even better."

When asked whether she was capable of working full-time, Wife responded: "Not

at this time." She said that her ability to work part-time "would depend" on the circumstances, but she believed that she "wouldn't be able to do anything that has to do with standing up or typing." Regarding her intention to provide financial support to her children, she answered: "It would depend on my health in the future. I don't know."

During closing arguments, counsel for Husband asked the court to impute income of $400 per week to Wife for the purpose of calculating alimony and child support. Counsel argued that Wife's testimony "made it abundantly clear [that] she [had] no intention to return to work" and that the court should not simply accept her self-reported opinion that she was physically unable to work. He pointed out that she had made no efforts to seek employment or to increase her employability and that she produced "no medical evidence" of documentation of her alleged ongoing symptoms. Counsel for Husband argued that, although it would be unreasonable to expect a 47-year-old woman with a 20-year employment gap to "go to work in some office and make $50,000.00 a year," the court should conclude that she could at least "get a job for forty hours a week making $10.00 an hour."

During closing, counsel for Wife asserted that she had not worked for two decades "by the agreement of the parties." Her attorney commented that, under her existing circumstances, "[s]he is at $10.00 an hour and [Husband] has admitted that." Her attorney argued that she was "entitled to indefinite alimony" because "her history of medical problems and . . . her current physical limitations" meant that she could "never hope to achieve a level of self-sufficiency that will enable her to obtain the standard of living the parties would have."

D. **Judgment of the Circuit Court**

On February 25, 2015, the circuit court issued a thoughtful and comprehensive memorandum opinion setting forth its rulings on each of the claims raised by the parties.

First, the court granted the divorce on the ground of Husband's adultery, finding that the allegations of adultery had been admitted and proven.

Wife received sole legal custody of the parties' two minor children. The court granted Husband's request for visitation rights with the parties' son, who was then a 15-year-old high school sophomore. Husband had not requested a visitation order regarding the minor daughter, a 17-year-old high school senior who was estranged from her father.

The court granted Wife use and possession of the family home until February 2016 and ordered Husband to continue paying the mortgage, taxes, and insurance during that period. The court directed that a trustee be appointed to sell the house as soon as possible after February 1, 2016, and to divide any net proceeds from the sale evenly between the parties.[2]

The court rejected Wife's argument that she was incapable of working and instead found that she was voluntarily impoverished. The court concluded that she had the capacity to work 40 hours per week at an "entry level" position with a salary of $10 per hour. The court agreed with Husband that "a conservative approach" of imputing a gross monthly income of $1,733.33 per month was "fair and appropriate." In addition, the court determined Husband's monthly gross income to be $18,614, a figure that was in

---

[2] At oral argument in March 2016, counsel informed us that Wife had moved out of the marital home, but that it had not yet been sold.

line with some of the highest estimates offered by Wife.

After weighing the statutory factors pertaining to an alimony award, the court awarded rehabilitative alimony of $1,800 per month for a period of 15 years. The court stated that Wife had not met her burden of proving that she was entitled to indefinite alimony. In view of Wife's failure to adduce medical or other evidence to substantiate her insistence that she was incapable of working, the court commented that it would not "speculate" on the questions of "how long it [would] take" for Wife to make sufficient progress and "how far she can be expected to progress."

The court evaluated the parties' child support obligations based on its findings that Husband's actual income was $18,614 per month and that Wife's potential income was $1,733 per month. The court ordered Husband to pay child support in the amount of $1,600 per month until February 2016 (the end of the period for use and possession of the family home) and $2,116 per month thereafter. The court also ordered Husband to continue to pay for medical insurance, dental insurance, and extraordinary medical expenses for the two minor children. The court rejected Wife's claim that the parties' 19-year-old daughter was a destitute adult child.

Among its other orders, the court granted Wife a monetary award of $81,122, representing one-half of the value of her husband's 401(k) retirement account. The court also awarded her 75 percent of the family furniture and transferred Husband's interest in an automobile to her. Finally, the court ordered Husband to pay $15,000 of the attorney's fees that Wife had incurred in pursuing her claims.

The court finalized its orders in a judgment entered on April 20, 2015. Thereafter,

-8-

Wife filed a timely appeal.

While the appeal was pending, Wife moved for a partial stay of the judgment. Effectively, she asked this Court to modify the portion of the judgment that provided that her use and possession of the family home would terminate on February 1, 2016. This Court denied the motion.

## QUESTIONS PRESENTED

In her appeal, Wife presents a number of questions and sub-questions. For analytical clarity, we have reorganized those issues[3] in this form:

I.     Did the trial court err or abuse its discretion in imputing income to Wife for the purposes of alimony and child support?

II.    Did the trial court abuse its discretion in awarding Wife rehabilitative alimony in the amount of $1,800 per month for a period of 15 years?

---

[3] In full, Wife phrased the questions as:

I.    Did the court err in failing to apply the standards contained within Md. Code Ann. Fam. Law § 11-106(c)?

    A.   Did the court abuse its discretion in failing to award indefinite alimony pursuant to subsection (c)(1)?

    B.   Did the court err in failing to conduct an analysis of subsection (c)(2)?

II.    Did the court abuse its discretion as to the amount and duration of the alimony award fails to meet the purpose of the statute?

III.   Did the court err in imputing income to the appellant in the child support and alimony calculation?

IV.   Did the Court abuse its discretion not to extend use and possession to a later date?

III.    Did the trial court abuse its discretion in granting Wife use and possession of the family home until February 1, 2016?

Addressing the first question, we conclude that there is no basis to set aside the court's findings as to Wife's short-term earning capacity. Nevertheless, we conclude that the court's alimony analysis was incomplete. After fully accepting the court's findings about the parties' incomes, we are unable to determine whether the court erred or abused its discretion in determining the amount and duration of alimony. Therefore, the awards must be vacated.

On the final issue, we conclude that the court properly exercised its discretion in setting a time limit for use and possession of the family home.

## DISCUSSION

## I.

The trial court imputed income to Wife for the purpose of evaluating her claims for alimony and child support. She contends that the court erred by finding that she was currently capable of earning $1,733 per month.

"Technically, 'imputed income' is a child support concept predicated on a finding of voluntary impoverishment[.]" *Reynolds v. Reynolds*, 216 Md. App. 205, 220 (2014). The Maryland child support guidelines define a parent's income as either: "(1) actual income of a parent, if the parent is employed to full capacity; or (2) potential income of a parent, if the parent is voluntarily impoverished." Md. Code (1984, 2012 Repl. Vol.), § 12-201(h) of the Family Law Article ("FL"); *see also* FL § 12-204(b) (providing that "if a parent is voluntarily impoverished, child support may be calculated based on a

-10-

determination of potential income" but that "[a] determination of potential income may not be made for a parent who . . . is unable to work because of a physical or mental disability").

Potential income means "income attributed to a parent determined by the parent's employment potential and probable earnings level based on, but not limited to, recent work history, occupational qualifications, prevailing job opportunities, and earnings levels in the community." FL § 12-201(*l*). Although the legislature has not defined the term "voluntary impoverishment," the courts have held that a parent is "considered 'voluntarily impoverished' whenever the parent has made the free and conscious choice, not compelled by factors beyond his or her control, to render himself or herself without adequate resources[.]" *Wills v. Jones*, 340 Md. 480, 490 (1995) (quoting *Goldberger v. Goldberger*, 96 Md. App. 313, 327 (1993)) (internal quotation marks omitted).[4]

The Family Law Article does not expressly require a trial court to consider a spouse's voluntary impoverishment or potential income for alimony purposes. Using more general terms, the alimony statute directs the court to "consider all the factors necessary for a fair and equitable award," including: "the ability of the party seeking alimony to be wholly or partly self-supporting" (FL § 11-106(b)(1)); "the time necessary for the party seeking alimony to gain sufficient education or training to enable that party

---

[4] In her brief, Wife states: "This is not a situation where [Wife] is attempting to lower her income for a more favorable child support or alimony award[.]" If true, that statement would be of no consequence here. A party may be voluntarily impoverished "regardless of the parent's intent regarding his or her support obligations." *Wills v. Jones*, 340 Md. at 494; *see also Wagner v. Wagner*, 109 Md. App. 1, 47 (1996).

-11-

to find suitable employment" (FL § 11-106(b)(2)); and "the financial needs and financial resources of each party, including . . . all income and assets" (FL § 11-106(b)(11)(i)). Consequently, the court may consider the potential income of a voluntarily impoverished spouse when it considers an alimony request. *See Reynolds*, 216 Md. App. at 220; *Turner v. Turner*, 147 Md. App. 350, 385 (2002); *Durkee v. Durkee*, 144 Md. App. 161, 181 (2002); *Long v. Long*, 141 Md. App. 341, 350-53 (2001); *Digges v. Digges*, 126 Md. App. 361, 379-81 (1999).

After a bench trial such as this one, an appellate court "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8-131(c). We review the court's findings as to a party's earning capacity under the clearly erroneous standard. *See Sieglein v. Schmidt*, 224 Md. App. 222, 249 (2015), *aff'd*, ___ Md. ___, 2016 WL 2941117 (May 20, 2016); *Reynolds*, 216 Md. App. at 222; *Long*, 141 Md. App. at 352; *Crabill v. Crabill*, 119 Md. App. 249, 265-66 (1998). Under that standard, "[i]f there is any competent evidence to support the factual findings [of the trial court], those findings cannot be held to be clearly erroneous." *Solomon v. Solomon*, 383 Md. 176, 202 (2004) (citation and quotation marks omitted).

In explaining its decision to impute income to Wife, the court stated that Wife had earned a bachelor's degree before the marriage and that she had earned $45,000 annually before she decided to stop working in 1995.[5] Although the parties had offered conflicting

___

[5] The trial court expressly analyzed the lengthy list of factors that this Court has recommended for evaluating the issue of voluntary impoverishment. *See generally*

narratives about that decision, the court credited Husband's testimony that he had merely acquiesced in Wife's unilateral decision. This finding was consistent with the court's other comments that Wife had demonstrated an "unwillingness to work" regardless of circumstances during the marriage and that she "insist[ed] on being totally supported by husband, because that was her perception of their agreement 19 years ago."

The court credited Wife's testimony that she had endured "severe lethargy" around the time of her 2009 cancer diagnosis. Yet the court was not persuaded by her testimony regarding the extent of her current condition:

> The problem with wife's assertions on her health status is that she produced absolutely no medical testimony to support it. While it is not disputed that she suffered from cancer, this appears to be in remission. There was no testimony as to her diagnosis, prognosis or current status. There was no testimony to support her other allegations of health problems and concerns. To the contrary, it was pointed out that she endured long days of trial and never presented as being unable to continue with the same. She spent many hours on the witness stand and did not appear fatigued, and quite frankly, she was quite combative and energetic in her sparring with opposing counsel, even at the end of long days. Such reflects her energy and ability.
>
> In addition, she provided much testimony of her running around for her children's activities, going on college visits and attending innumerable sports tournaments. None of these activities were limited by her alleged medical conditions. Something more than her bald assertion, which was unsupported by her other testimony and her courtroom demeanor, should be shown to make a claim for permanent disability. . . .

Concluding that Wife "should be able to work a 40-hour week earning $10 per

---

*Lorincz v. Lorincz*, 183 Md. App. 312, 331 (2008) (citing *John O. v. Jane O.*, 90 Md. App. 406, 422 (1992)); *see also Petrini v. Petrini*, 336 Md. 453, 466 n.13 (1994) (citing *Goldberger v. Goldberger*, 96 Md. App. 313, 327-28 (1993)).

hour at this time," the court imputed to her "$20,800 annual income, which equates to $1,733.33 per month." We see no error, let alone clear error, in these findings.

In her appeal, Wife asserts that the evidence showed that she was wholly incapable of earning income. Relying on her own testimony regarding fatigue, depression, and neuropathy, she asserts that the facts at trial "paint a picture of someone who is not likely" to be able to support herself. It may be true that her testimony, if believed in its entirety, would have been sufficient for a court to find that she was incapable of holding a job. *See Allison v. Allison*, 160 Md. App. 331, 345 (2004). On the other hand, her testimony "by no means compelled that conclusion." *Id.*

The court was entitled to weigh Wife's testimony in light of the other evidence about her active lifestyle. *See Schwartz v. Wagner*, 116 Md. App. 720, 725 (1997) (noting that prior appellate decision in same case had upheld trial court's decision to impute income to wife where the wife's "allegation that she [could not] work long hours because of her health was belied by the fact" that she had endured extensive travel periods and where she produced no corroborating medical testimony). The court was also competent to draw inferences about Wife's condition based on its first-hand observations. *See Blake v. Blake*, 81 Md. App. 712, 728 (1990).

Even where a court accepts uncontradicted evidence that a person has medical problems, the court need not necessarily conclude that the person is incapable of earning income. *See Karmand v. Karmand*, 145 Md. App. 317, 333-34 (2002) (upholding finding that husband was capable of supporting himself where judge "accepted the uncontradicted evidence about the state of the [husband's] health, but found, contrary to

-14-

his assertion, that the state of his health was not interfering with his ability to work"); *Long*, 129 Md. App. at 581 (holding that trial court did not err in finding that wife was "at least somewhat capable of supporting herself," where evidence of wife's depression and other "mental health problems was uncontested" but where other evidence showed that these conditions "did not totally bind her to the family home" and that wife had been financially successful in the past); *see also Hiltz v. Hiltz*, 213 Md. App. 317, 344-46 (2013) (holding that trial court was not required to conclude that wife was disabled for alimony purposes, where she testified about her disability and offered documentation of her Social Security disability benefits, but where she produced no medical testimony and where other evidence indicated that she was otherwise active and did not "stay in bed all day as she claim[ed]").

In any event, even if the court had been required to credit every word of Wife's testimony (which it was not), the court would not have been required to infer that she was incapable of working an eight-hour day. As the trial court indicated, her own testimony was inconclusive on this point, because she had discussed her inability to work a 10- or 12-hour day. She opined that she was not ready for full-time work "at this time," but she stated that her opinion on that matter "would depend" on her future doctors' recommendations and on the type of work. She also suggested that the divorce itself was contributing to her vulnerability, and she expressed her intention to re-evaluate in November 2015 – *i.e.,* the month after the trial. In her own words, she stated that she "d[id]n't know" whether she would be capable of contributing financially to the support of her children in the future. Similarly, during closing argument, her attorney was

equivocal about whether Wife contended that she was utterly incapable of supporting herself, or only partially so.

Wife has expressly challenged the court's finding that she had the ability to work, but she does not argue that the court otherwise erred or abused its discretion in determining the *amount* of potential income. Potential income "is not the type of fact which is capable of being verified through documentation or otherwise[,]" and indeed "any determination of potential income must necessarily involve a degree of speculation." *Malin v. Mininberg*, 153 Md. App. 358, 406-07 (2003) (citing *Reuter v. Reuter*, 102 Md. App. 212, 223-24 (1994)) (internal quotation marks omitted). An appellate court will uphold a trial court's determination of potential income as long as the underlying factual findings are not clearly wrong, and "the amount calculated is realistic" and not "so unreasonably high or low as to amount to an abuse of discretion[.]" *Sieglein*, 224 Md. App. at 249 (citing *Reuter*, 102 Md. App. at 223) (quotation marks omitted).

In the present case, Wife has challenged only the court's finding as to the number of hours she could reasonably work. She had not disputed the assertions that, if she were capable of working, she could earn $10 per hour, which is slightly higher than this State's minimum wage.[6] During closing arguments, Wife's attorney essentially conceded that the reasonableness of this estimate, by stating: "She is at $10 an hour[.]" We see nothing unreasonable in the conclusion that Wife, as a capable, college-educated, 47-year-old

---

[6] The minimum wage increased to $8.25 per hour on July 1, 2015. *See* Md. Code (1991, 2008 Repl. Vol., 2015 Supp.), § 3-413(c) of the Labor and Employment Article. The rate is scheduled to increase to $8.75 on July 1, 2016; to $9.25 on July 1, 2017; and to $10.10 per hour on July 1, 2018. *Id.*

woman, had the potential to gain full-time employment at that modest hourly rate, despite her health problems and employment gap. Thus we see no error in the decision to impute income to Wife of $1,733.33 per month.

**II.**

Even though we accept the court's finding as to Wife's potential income at the time of the divorce, we cannot do the same for the court's assessment of her *future* earning capacity. The court's findings on this matter are central to an award of rehabilitative alimony. The court must reevaluate the award in this case because the original order was not grounded in the analysis required by the statute and the cases interpreting it.

In Maryland, the principal function of alimony is "rehabilitation of the economically dependent spouse." *Whittington v. Whittington*, 172 Md. App. 317, 335-36 (2007) (citing *Karmand*, 145 Md. App. at 327). The "'statutory scheme generally favors fixed-term or so-called rehabilitative alimony . . . where practicable to ease the transition from the joint married state to their new status as single people living apart and independently.'" *Solomon*, 383 Md. at 195 (quoting *Tracey v. Tracey*, 328 Md. 380, 391 (1992)). In other words, "alimony's purpose is to provide an opportunity for the recipient spouse to become self-supporting." *Tracey*, 328 Md. at 391 (citations and quotation marks omitted); *see also Hull v. Hull*, 83 Md. App. 218, 223 (1990) (stating that the goal of rehabilitative alimony is "to vitiate any further need for alimony"). On the other hand, an alimony award should not be "designed to create a subsistence level for the more [dependent] spouse." *Strauss v. Strauss*, 101 Md. App. 490, 512 (1994).

Section 11-106(b) of the Family Law Article lists the familiar monetary and equitable factors that a court must consider in determining the amount and period of an alimony award. The circuit court's opinion included a detailed and thorough discussion of these considerations. Many of the court's findings are not at issue in this appeal.

In summary, the court found that: the parties "enjoyed a high, upper middle class standard of living," but had lived "beyond their means" during the marriage (addressing FL § 11-106(b)(3)); the marriage lasted for 20 years, but it was only an "active marriage" for 18 of those years (FL § 11-106(b)(4)); Husband made almost all of the monetary contributions, while Wife made most of the non-monetary contributions as primary caregiver to the children (FL § 11-106(b)(5)); the breakup directly resulted from Husband's affair and his subsequent deceptive behavior, but other underlying problems with the parties' financial habits and Wife's "confrontation and aggression" also contributed to their estrangement (FL § 11-106(b)(6)); Husband and Wife were 46 and 47 years old, respectively (FL § 11-106(b)(7)); Husband had no significant health concerns, but Wife suffered from both physical and mental health problems (FL § 11-106(b)(8)); Husband's high income was currently overwhelmed by the mortgage and other financial obligations, and both parties would "need to make serious adjustments in their spending habits" (FL § 11-106(b)(9)); Husband had agreed to pay for the children's ongoing medical expenses (FL § 11-106(b)(10)); and the parties had few assets aside from equity in the marital home and Husband's retirement savings, which the court would divide evenly (FL § 11-106(b)(11)).

In its discussion of "the ability of the party seeking alimony to be wholly or partly

self-supporting" (FL § 11-106(b)(1)), the court found that Wife was currently capable of earning $20,800 in annual income, the equivalent of $1,733.33 in monthly income. Yet the court did not explicitly compare that level of income with Wife's reasonable needs. Hence, the opinion included no express statement about whether Wife would be either "wholly" or "partly" self-supporting with that amount of imputed income. The court's analysis "seemed to suggest" that Wife would not be fully self-supporting at that imputed income level, but then it "fail[ed] to make that finding." *Brewer v. Brewer*, 156 Md. App. 77, 101 (2004).

A spouse is not necessarily "self-supporting" under the alimony statute merely because the spouse has enough income "to hold body and soul together." *Tracey*, 328 Md. at 392. In general, a party is self-supporting if the party's income exceeds the party's "reasonable" expenses, as determined by the court. *See id.* at 390; *Reynolds*, 216 Md. App. at 221-22; *Lee v. Lee*, 148 Md. App. 432, 448 (2002); *Reuter*, 102 Md. App. at 223. The court determines the appropriate level of reasonable need based on all of the statutory alimony factors, including the standard of living established during the marriage. *See Reynolds*, 216 Md. App. at 226.

The court discussed Wife's financial needs elsewhere in its opinion. Wife had submitted a financial statement in which she claimed monthly expenses of $6,244 for herself and $4,309 for her children. The court identified a total of $2,525 of those expense items that Wife had either agreed to eliminate or that the court believed were inflated. The court commented that the apparent exaggerations tended to "draw her entire expense sheet into question[] and make it difficult to accurately assess her needs."

It is "an unfortunate fact that expenses are sometimes exaggerated when financial statements are prepared for use in domestic relations cases," and therefore "the trial court is not required to set forth its exact thought process in arriving at conclusions" regarding a spouse's reasonable expenses. *Allison*, 160 Md. App. at 345. Yet despite the court's effort to give a realistic evaluation of Wife's expenses, the opinion still left the parties and this Court without any clear statement about her reasonable needs. As a consequence, we cannot determine whether she would be wholly self-supporting with her imputed income, or even with her imputed income plus a monthly alimony payment. A calculation of the recipient spouse's future expenses and income "is obviously an important component to any finding of self-sufficiency" (*see Doser v. Doser*, 106 Md. App. 329, 353-54 (1995)), and without those findings it is "unclear whether, and if so the degree to which, [the recipient spouse] will be able to become self-supporting." *Id.* at 357; *see also Brewer*, 156 Md. App. at 101.

The circuit court went on to decry the dearth of evidence regarding the time necessary for Wife to improve her employability, under FL § 11-106(b)(2). This Court has characterized "the mandatory factor in section 11-106(b)(2)" as an element that "goes to the heart" of Maryland's rehabilitation-based alimony scheme. *Long*, 129 Md. App. at 582.

The court observed that Wife had offered "no anecdotal or current experience testimony to shed light on this issue" and had produced no "vocational expert to discuss her potential income." For his part, Husband merely asserted that she would be wholly self-supporting within two years, without any evidence or even an argument to justify

that time frame.  The court found that the evidence supported the inference that Wife's

income would grow over the years, but the court could not (at that time) hazard a guess as

to how much growth could be expected over any period of time:

> Wife does not present as any shrinking violet, but rather as a very strong personality, and given her education, past work experience (although dated) and her personality, this Court would expect her to progress quickly beyond that starting level.  As indicated before, there was a lack of evidence on what her earning growth could be expected to be, and it seems that both parties want the Court to speculate about wife's earning potential or lack thereof.  This Court will not do that.  While wife should be able to gain employment at an entry level, it would be expected to take some time for her income to grow.

Although the court's refusal to speculate is perfectly understandable (*see Walter v.

Walter*, 181 Md. App. 273, 288 (2008)), the problem is that the law still requires the court

to "project[] forward in time to the point when the requesting spouse will have made

maximum financial progress, and compar[e] the relative standards of living of the parties

at that future time." *Whittington*, 172 Md. App. at 338 (citations and quotation marks

omitted).  In other words, the law puts the trial court in a conundrum: it cannot speculate,

but it must project.  The conundrum is particularly acute in a case like this, where the

recipient spouse has taken the position that she is unable to work and has refused to put

on evidence about the financial progress that she is likely to make.  Nevertheless, by

making an inconclusive finding on the issue of when Wife "will have made maximum

financial progress," the court compounded the earlier difficulty that arose from the lack

of a clear finding regarding the income Wife needed to become self-sufficient.

The core considerations of FL §§ 11-106(b)(1) and (b)(2) are closely connected to

the issue of whether to grant alimony for a fixed or indefinite period.  The statute

authorizes the court to award alimony for an indefinite period if it finds that, "due to age, illness, infirmity, or disability, the party seeking alimony cannot reasonably be expected to make substantial progress toward becoming self-supporting[.]" FL § 11-106(c)(1). Consistent with its other findings, the circuit court concluded that Wife had not proven any "age, illness, infirmity, or disability" that would preclude her from working. As discussed previously, we agree that the evidence supported a finding that Wife could currently earn an annual income of $20,800. Earning such a salary and increasing it over time would be, at the very least, "progress toward becoming self-supporting[.]"

"[S]elf-sufficiency per se does not bar an award of indefinite alimony[.]" *Tracey*, 328 Md. at 392. The court may award indefinite alimony if it finds that "even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate." FL § 11-106(c)(2). "A trial court must evaluate and compare" the parties' respective post-divorce standards of living "as a separate step in making its judgment" on a claim for indefinite alimony. *Tracey*, 328 Md. at 393. "In this context, 'standards of living' means how well the respective parties can live based on their respective financial means." *Boemio v. Boemio*, 414 Md. 118, 144 (2010). To make the necessary comparison, the court "should project those standards for the future, based on all of the available evidence." *Id.* at 144 n.18; *see also Blaine v. Blaine*, 336 Md. 49, 64 (1994) ("the language of § 11-106 is prospective, in effect requiring that the court make a prediction as to the success of the dependent spouse's efforts to become self-sufficient").

A comparison of the parties' predicted future incomes is not the sole component of the comparison of future living standards, but it is necessary. "[I]n analyzing whether indefinite alimony should be granted under FL [§] 11-106(c)(2), it is of paramount importance to know what future income (of the dependent spouse) is being projected." *Allison*, 160 Md. App. at 342-43. If a reviewing court is "in the dark . . . as to what future income the trial judge thought [the dependent spouse] would have[,]" the court is unable to determine whether the trial judge abused his or her discretion in the alimony ruling. *Freedenburg v. Freedenburg*, 123 Md. App. 729, 750 (1998).

This Court will vacate an award and remand for reconsideration of the alimony issue if the record makes it unclear whether the trial court made the necessary prediction and comparison of the parties' incomes and living standards at the point of maximum rehabilitation. *See Hart v. Hart*, 169 Md. App. 151, 167-70 (2006); *Simonds v. Simonds*, 165 Md. App. 591, 608, 611 (2005); *Allison*, 160 Md. App. at 342-44; *Brewer*, 156 Md. App. at 101-04; *Kelly v. Kelly*, 153 Md. App. 260, 278 (2003). Remand is also required if a court makes a projected income finding that does not appear to be based on reasonable inferences drawn from competent evidence. *See Walter*, 181 Md. App. at 288.

For its analysis under FL § 11-106(c)(2), the circuit court wrote:

> The second basis for indefinite alimony . . . is a closer call and is the real question in this case. . . . [W]ife's evidence on this issue was quite lacking, and she is the party with the burden of proof. There has been no effort on wife's part, no anecdotal history available and no vocational opinion on this issue. She merely insists on an award of indefinite alimony[,] requiring the Court to speculate about her earning capacity or lack thereof.

Wife was successful in the past, and having hear[d] the testimony and observed her in Court, there is no reason to doubt her future success. Obviously, it is ridiculous to expect her to walk out the door after 19 years and earn any substantial income, but it would not be unreasonable to expect her to progress in her chosen occupation, once she does re-engage in the workforce. Husband has achieved a high level of income while wife tended the children and the marital home. She moved around to accommodate husband's job opportunities. She also should be afforded time to refresh her vocational marketability and to grow in the field/job that she chooses. Like husband's career, that also will take time. The questions are how long will it take and how far can she be expected to progress. There was little evidence of any attempt, any strategy or any prognosis. Wife has thrown up her hands and has left this Court to speculate, which this Court is not permitted to do.

Accordingly, this Court finds that wife has not met her burden of proof for indefinite alimony, but the Court also finds that husband's recommendation of two years is unsupported by common sense. The Court shall set the term of alimony for a period of 15 years, which will take wife to the age of 62, and which will give her time to find a field of work and to grow in it to a level where the standards of living of the parties will not be unconscionably disparate.

Wife contends that the circuit court failed to "project[] forward the parties['] future standards of living after maximum rehabilitation has occurred." As a related point, she argues that "the duration of rehabilitative alimony for a period of 15 years was arbitrary[.]" She likens the present case to *Long v. Long*, 129 Md. App. 554 (2000), and *Lee v. Lee*, 148 Md. App. 432 (2002). These comparisons are apt.

In *Long*, 129 Md. App. at 579-85, this Court held that a trial court had abused its discretion in awarding rehabilitative alimony for a fixed term that was not adequately explained by the evidence. In support of a claim for indefinite alimony, a wife had presented evidence that she had not worked for several years and that she suffered from mental health issues that prevented her from working. *Id.* at 560-61. The circuit court

discounted that evidence and concluded, based on the wife's employment history, that she was capable of supporting herself at least in part. *Id.* at 580-81. Because the court ordered four years of rehabilitative alimony without reaching any conclusion as to the time necessary for the wife to gain suitable employment, it was impossible for this Court to "ascertain from whence [the] determination on duration of alimony came[.]" *Id.* at 581. We concluded that the court abused its discretion by failing "to draw a solid line between the facts and the remedy, explaining fully how the former justifies the latter[.]" *Id.* at 582-83.

Similarly, in *Lee*, this Court vacated a three-year alimony award where the trial judge "failed to explain adequately his reasons for the duration of the rehabilitative alimony award in relation to the disparity of income he found to currently exist[.]" *Lee*, 148 Md. App. at 444. In that case, the evidence showed that the spouse seeking alimony was employed but not self-supporting and that she had potential to earn a slightly higher salary. *See id.* at 435-37. The trial judge believed that the wife could take courses that would enhance her income, but he nonetheless "gave no clue as to why he believed Mrs. Lee could be self-supporting in three years (assuming he did have that belief) or what line of work he thought she could engage in to allow her to become self-supporting." *Id.* at 444. In other words, "the duration of the rehabilitative alimony appear[ed] to have been pulled out of 'thin air.'" *Id.* at 447. Even though the court made vague predictions that the wife would increase her income over time, the court erred by failing to make a "prediction of what Mrs. Lee would be earning when the rehabilitative period was concluded[.]" *Id*. at 449. On remand, we instructed the court to take additional evidence

-25-

if necessary, to re-evaluate the award, and to explain its "thought process" (*id.* at 456) in regard to FL § 11-106(c)(2).

As the case law illustrates, making the type of prediction required by FL § 11-106(c)(2) is sometimes an exceptionally difficult task. In the present case, the trial court made a commendable attempt to reach an equitable result despite the gulf between the analysis dictated by the statute and the evidence offered by the parties. The evidence conclusively showed that, even after imputing income to Wife, she was entitled to alimony at least in the 2015 and 2016 calendar years. Husband conceded as much in his closing argument, and rightly so. *See Rogers v. Rogers*, 80 Md. App. 575, 591-92 (1989) (holding that court abused discretion in denying alimony where highest salary ever earned by wife was small fraction of husband's current salary). The court evidently agreed that Wife had satisfied at least that initial burden of showing her entitlement to alimony in some amount for some period.

The court refused to credit the only direct evidence from the parties regarding Wife's future income prospects – her own testimony that she expected herself to earn no meaningful income. The court concluded that she was capable of working full-time in an entry-level job and increasing her income over time. As the court correctly observed, the trial record did not answer the questions of "how long [it would] take" for her to become self-sufficient and "how far she c[ould] be expected to progress."

Essentially, the court concluded that it lacked enough evidence at that time to make any meaningful prediction about Wife's future prospects for self-sufficiency. On this point, we agree. But the court went on to award a specific amount of alimony for a

-26-

specific duration. On that matter, the court erred.

In his brief, Husband does not explain how the 15-year term is "rehabilitative." The court's only stated justification for this period was that Wife needed "time to find a field of work and grow in it to a level where the standards of living of the parties will not be unconscionably disparate." To the extent that the court attempted to make a projection, it appears to have focused on the wrong goal. In the words of the statute, the relevant point in time is when "the party seeking alimony will have made as much *progress toward becoming self-supporting* as can reasonably be expected[.]" FL § 11-106(c)(2) (emphasis added); *see Francz v. Francz*, 157 Md. App. 676, 701 (2004) ("[t]he comparison to be made is between [the payor's] post-divorce standard of living and [the recipient's] post-divorce standard of living upon making as much progress toward becoming self-supporting as reasonably can be expected"). The court focused not on the rehabilitative goal of self-sufficiency but on Wife's ultimate progress towards alleviating the income disparity.[7]

Husband does not argue that the trial court completed the type of analysis dictated by statute and precedent. Instead, he focuses on the court's statements that Wife had failed to satisfy her burden of proving that she was entitled to indefinite alimony. He suggests that, because Wife offered no credible evidence on her future prognosis, the

---

[7] A person may become self-supporting before that person reaches a maximum income potential. It is probably more difficult to project a person's entire career arc than it is to predict when a person can be expected to attain a particular threshold of self-sufficiency. Future expectations of income growth after self-sufficiency are still relevant, but only for evaluating whether the remaining disparity is unconscionable.

court did not need to make findings as to her rehabilitation period and future standard of living. He concludes by characterizing the 15-year term as "very generous" in light of her failure of proof.

As the circuit court correctly recognized, a spouse seeking indefinite alimony normally bears the burden of proving the statutory prerequisites to such an award. *See Reynolds*, 216 Md. App. at 221; *Francz*, 157 Md. App. at 692; *Turner*, 147 Md. App. at 389; *Crabill*, 119 Md. App. at 260-61; *Doser*, 106 Md. App. at 353; *Thomasian v. Thomasian*, 79 Md. App. 188, 195 (1989). Still, a court may not grant rehabilitative alimony in a particular duration without the requisite findings and predictions. Rather, "an award of temporary alimony must be grounded in a finding that the recipient spouse is not self-supporting and needs training, education, or other steps to help that spouse achieve financial self-reliance." *Karmand*, 145 Md. App. at 328 (citing *Reuter*, 102 Md. App. at 229). More specifically, "there must be some relation between the length of the award and the conclusion of fact as to the income disparity made by the court." *Benkin v. Benkin*, 71 Md. App. 191, 204 (1987). From our perspective, it makes no difference that the 15-year rehabilitation term was "generous" or not. We cannot uphold an alimony determination that is not based on sound legal principles and competent evidence.

The existing record may not have been sufficient for the court to make findings about the time necessary for Wife to gain sufficient education or training to enable her to find suitable employment, under FL § 11-106(b)(2), and whether the parties' respective standards of living will be unconscionably disparate even after she will have made as much progress toward becoming self-supporting as can reasonably be expected, under FL

§ 11-106(c)(2). In conducting further proceedings, the court may accept additional evidence on those issues. *See Hiltz*, 213 Md. App. at 346; *Lee*, 148 Md. App. at 456. Both parties "may introduce additional evidence on the issue of both of their earnings, past and present, including evidence that is up-to-date." *Walter*, 181 Md. App. at 288; *see also Digges*, 126 Md. App. at 370. Wife shall continue to bear the burden of proving her entitlement to indefinite alimony. "[S]he must show that, projecting into the future *from the present (not from the time of the merits trial)*, even after she will have made as much progress toward self-sufficiency as reasonably can be expected, there will be an unconscionable disparity between her standard of living" and that of her former husband. *Francz*, 157 Md. App. at 701.

When the court receives "fresh evidence as to the current incomes and needs of both parties[,]" it may become possible "to produce evidence relative to [Wife's] prospects for future earnings." *Rogers*, 80 Md. App. at 594-95. For instance, Wife might be able to offer the type of "anecdotal" or other testimony that the court lacked at the time of the original judgment. If the court believes that it still lacks sufficient credible evidence to make the necessary findings, it might appoint a neutral expert under Md. Rule 5-706 to assess Wife's earning capacity. *E.g. Solomon*, 383 Md. at 183; *Baer v. Baer*, 128 Md. App. 469, 490 (1999). Even though expert testimony is not usually required for predicting whether a party will become self-sufficient (*see Doser*, 106 Md. App. at 353 n.7; *Blake*, 81 Md. App. at 728), testimony from a court-appointed expert, whose fees are paid by the parties (perhaps from the proceeds of the sale of the house), may be a practical method for making an alimony determination here.

-29-

In her brief, Wife asks this Court to do more than simply vacate the alimony award. She contends that, even accepting the court's findings of potential income, the alimony award was inadequate as a matter of law. Her argument focuses on the gross disparity between her potential monthly income of $1,733 and her husband's actual monthly income of $18,614. She observes that an alimony transfer of $1,800 would increase her gross income to only $3,533 per month, leaving her husband with $16,814 in gross income. In other words, her post-alimony, pre-tax income would be about 21 percent of that of her husband in the near future. She argues that, in light of that disparity, her contributions to the family that allowed her husband to increase his earning capacity during the 19-year marriage, and the court's decision to grant the divorce on the grounds of the husband's adultery, the court was required to grant indefinite alimony in an amount greater than $1,800 per month.

In cases involving dramatic income disparities after long marriages, this Court has found an abuse of discretion in a trial court's failure to award indefinite alimony. *See Wassif v. Wassif*, 77 Md. App. 750, 754-58 (1989); *Holston v. Holston*, 58 Md. App. 308, 320-24 (1984); *see also Lee*, 148 Md. App. at 448-49; *Long*, 129 Md. App. at 584-85; *Rogers*, 80 Md. App. at 588-92. Even in cases where indefinite alimony is granted, a court abuses its discretion if the amount of indefinite alimony does not alleviate the remaining disparity. *See Solomon*, 383 Md. at 197-201; *Turner*, 147 Md. App. at 392. Nevertheless, there is no single test for indefinite alimony based on a raw income percentage differential or the length of a marriage. *See Boemio*, 414 Md. at 140-43 & n.17; *Whittington*, 172 Md. App. at 339-40. The court must still "consider all the factors

necessary for a fair and equitable award" (FL § 11-106(b)) and exercise its discretion based on the individual facts of the case. In this case, the "missing ingredient" (*Lee*, 148 Md. App. at 456) is still the court's future prognosis for the parties.

The most relevant point of comparison under FL § 11-106(c)(2) is not the parties' respective incomes in the year after the divorce, as Wife suggests. The statute requires a comparison of the disparity in the parties' future standards of living at the hypothetical point in time when Wife will have made as much progress towards becoming self-supporting as can reasonably be expected. Depending on the court's projections for the two parties, the initial percentage comparison might not reflect the ratio at the end of a rehabilitation period. At this point, it would be premature to hold that the alimony amount was insufficient or that the trial court erred by failing to find an unconscionable disparity under FL § 11-106(c)(2).[8]

---

[8] To guide the proceedings on remand, an additional comment is appropriate. The court emphasized that a "major problem with the family's financial picture [wa]s the $2,814 mortgage for the marital home[.]" The court permitted Wife to occupy the home until February 2016 and ordered Husband to assume financial responsibility for the home until that time. When the trial court calculated child support, it accounted for the large financial shift at the end of the use and possession period. For reasons not fully explained in the opinion, however, the court does not appear to have accounted for that event in its alimony award. Before February 2016, Wife's standard of living would be temporarily enhanced by living rent-free in a four-bedroom home worth nearly a half a million dollars. After February 2016, however, she would need to pay for her own housing, in addition to paying for her other basic living expenses (and possibly her own health insurance), her minimum support obligations to her minor son, and taxes on her wages and alimony received. On the other hand, Husband will gain several thousand dollars in extra funds each month once the house was sold. In sum, Wife's standard of living will plunge and her financial needs will increase at the end of the use and possession period, while Husband's financial obligations will decrease and his ability to pay alimony will increase. The family home was so central to the parties' relative

Our decision to vacate the alimony award does not affect only that portion of the judgment.  Maryland's child support statute requires a court to account for alimony transfers between parents before calculating the parents' child support obligations.  *See* FL § 12-204(a)(2); *see also* FL § 12-201(b)(3)(xv) (parent's income for child support guidelines includes "alimony or maintenance received").  More broadly, a court's determinations as to alimony, child support, monetary awards, and counsel fees involve overlapping evaluations of the parties' financial circumstances.  The factors underlying such awards "are so interrelated that, when a trial court considers a claim for any one of them, it must weigh the award of any other." *Turner*, 147 Md. App. at 400.  "Therefore, when this Court vacates one such award, we often vacate the remaining awards for re-evaluation." *Id.* at 401 (collecting cases); *see also Hiltz*, 213 Md. App. at 322 n.3 (citing *Doser*, 106 Md. App. at 335); *Murray v. Murray*, 190 Md. App. 553, 572 (2010).

Because we are remanding this case for a re-evaluation of the amount and duration of alimony, we will also vacate the interrelated orders regarding child support, the monetary award, and counsel fees.  Until the circuit court completes the proceedings required by this opinion, the existing orders for alimony and child support will continue to have "the force and effect of a *pendente lite* award." *Simonds*, 165 Md. App. at 613.

**III.**

As the final issue in this appeal, Wife contends that the trial court abused its discretion when it granted her use and possession of the family home and required

positions that the court should consider and explain the amount of alimony in light of the orders as to use and possession of the home.

Husband to bear financial responsibility for the home until February 1, 2016, approximately 11 months after the court issued its opinion.

In connection with divorce and related proceedings, the court may "exercise its power to 'enable any child of the family to continue to live in the environment and community that are familiar to the child' and 'to provide for the continued occupancy of the family home . . . by a party with custody of a child who has a need to live in that home.'" *Kelly v. Kelly*, 153 Md. App. 260, 268-69 (2003) (quoting FL § 8-206). For a period of up to three years after the date of the divorce (FL § 8-210(a)), the court may grant a party the sole use and possession of the family home. FL § 8-208(a)(1)(i). In addition, "the trial court may order one or both of the parents to contribute to the mortgage on the family home, insurance, and taxes." *Knott v. Knott*, 146 Md. App. 232, 250 (2002) (citing FL § 8-208(c)).

To evaluate a claim for use and possession of the family home, the court must consider: "(1) the best interests of any child; (2) the interest of each party in continuing (i) to . . . use the family home or any part of it as a dwelling place; or (ii) to . . . occupy or use the family home or any part of it for the production of income; and (3) any hardship imposed on the party whose interest in the family home . . . is infringed" by a use and possession order. FL § 8-208(b). The trial court's decision "in awarding possession and use of a family home will not be disturbed on appeal in the absence of a showing that it was exercised in an arbitrary manner or a showing that [the trial court's] judgment was clearly erroneous." *Court v. Court*, 67 Md. App. 679, 684 (1986).

The circuit court's opinion included a thorough analysis of these statutory factors

as applied to the facts of the case. The court noted that the family's four-bedroom home was located "in the C. Milton Wright High School district where [the parties' two minor children] attend as a senior and sophomore, respectively." The court recounted that the family lost roughly $100,000 of equity as part of the 2005 transaction to avoid foreclosure, and then avoided a second foreclosure threat in 2010 by renegotiating a mortgage with a graduated interest schedule. The court explained that this history demonstrated that the parties had placed great importance on having their children live in that house, even though "the cost of th[at] particular house exceeded the family's budget and financial resources" and even though Wife was consistently unwilling to work "even with the family's home on the line."

In considering the best interests of the children under FL § 8-208(b)(1), the court concluded that both minor children would benefit if they finished high school in their current school. The court noted that even if the use and possession period terminated before the graduation of their son in 2017, he could still finish his final year at that school through his father's continued residence in the same district or through his mother's acquisition of more affordable housing in the area.

Addressing the second consideration, *see* FL § 8-208(b)(2), the court recognized that Wife also had an interest in continuing to use the family home as her residence. The court noted that it seemed appropriate to afford her "some transitional time[.]"

In addressing the third consideration, *see* FL § 8-208(b)(3), the court found that an extended use and possession term would result in a "severe hardship" to Husband, who bore sole financial responsibility for the property. Husband's 2010 loan modification had

granted him the temporary reprieve of a two percent interest rate, followed by increases to three percent in March 2015, four percent in March 2016, and over five percent in March 2017. Each increase resulted in hundreds of dollars in additional monthly payments. The court determined that Husband was "in no realistic position to maintain the home" on those terms while also meeting his post-divorce support obligations and his own reasonable living expenses. Furthermore, the court reasoned that "[m]aintaining this level of financial obligation . . . could lead to a stressful situation which could impact" the couple's son. The court also reasoned that, because "the parties ha[d] no other liquid assets that could be used to satisfy creditors," both parties might benefit from an earlier sale of the home. The court concluded:

> Accordingly, laying out all of the factors and considerations, the Court will order use and possession of the family home and family use personal property to wife until February 1, 2016. That term allows [the parties' minor daughter] to graduate, [the parties' son] to get halfway through his junior year, and wife almost a year to transition to a new home without having major changes occur over the holidays at the end of 2015.

In her brief, Wife complains that the court could have chosen other "[m]ore palatable options[.]" She asserts that "[t]he Court's award appears entirely focused on the needs of Husband[.]"

Upon any fair reading of the circuit court's actual opinion, it does not "appear[]" that way at all. The court struck a reasonable balance between, on one hand, the best interests of the children and Wife's interest in using the home as her dwelling, and, on the other hand, the hardship that would be imposed on Husband, as the party with financial responsibility for the home. Nothing in this well-reasoned ruling can be described as

anything remotely resembling an abuse of judicial discretion. *See Bussell v. Bussell*, 194 Md. App. 137, 159 (2010).[9]

CONCLUSION

Our central conclusion in this opinion is that we cannot uphold the court's award of rehabilitative alimony in the amount of $1,800 per month for 15 years. Further proceedings are necessary.

The court may accept additional evidence about each party's actual or potential income, including evidence about their incomes since the original trial. The parties should supplement the record with enough additional information for the court to evaluate all of the considerations under FL § 11-106(b) and (c). Specifically, the evidence must address the unresolved issues about whether Wife is currently self-supporting, what level of income she would need to become self-supporting, whether she needs any period of additional training or education to gain suitable employment, how much she can reasonably be expected to earn in her progress toward becoming self-supporting, and how much time she would need to achieve that progress. If necessary, the court should exercise its power under Md. Rule 5-706 to appoint a vocational rehabilitation expert.

After resolving the factual issues, the court should examine all necessary factors and exercise its independent judgment to determine the appropriate amount and period of an award under FL § 11-106(b) and (c). If the court determines that a fixed term is

---

[9] On remand, the court should account for the disposition of the family home when making its alimony and child support rulings. *See supra* note 7.

appropriate, it should explain the duration based on the evidence.

Even if the court expects Wife to become self-supporting in the near future, the court should fully analyze whether indefinite alimony is appropriate under FL § 11-106(c)(2). Based on all of the evidence, the court should predict the parties' future incomes and standards of living at the time when Wife will have made maximum progress toward becoming self-supporting and then compare their living standards at that time. If the court finds that their respective standards of the parties will be unconscionably disparate, then the court should award indefinite alimony in an amount sufficient to alleviate the remaining disparity. *See Solomon*, 383 Md. at 197-201.

After resolving Wife's alimony claim consistent with this opinion, the court should re-assess the parties' child support obligations. In light of any revised findings and rulings on alimony, the court should also re-assess (as needed) its rulings on the related issues of monetary award and attorney's fees.

> **JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY AFFIRMED IN PART AND VACATED IN PART. JUDGMENT WITH RESPECT TO ALIMONY, CHILD SUPPORT, MONETARY AWARD, AND ATTORNEY'S FEES VACATED; ALIMONY AND CHILD SUPPORT PROVISIONS TO REMAIN IN FORCE AND EFFECT AS PENDENTE LITE ORDERS PENDING FURTHER ORDERS OF THE CIRCUIT COURT; JUDGMENT OTHERWISE AFFIRMED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. APPELLANT TO PAY TWO-THIRDS OF COSTS AND**

**APPELLEE TO PAY ONE-THIRD OF COSTS.**